945 So.2d 307 (2006)
Polly Ann RUTLEDGE, Plaintiff-Appellee,
v.
John Price RUTLEDGE, Jr., Defendant-Appellant.
No. 41,792-CA.
Court of Appeal of Louisiana, Second Circuit.
December 13, 2006.
*309 James A. Hobbs, West Monroe, for Appellant.
Robert W. Kostelka, for Appellee.
Before BROWN, GASKINS and CARAWAY, JJ.
GASKINS, J.
In this child custody and support matter, the father, John Price Rutledge, Jr., appeals from a trial court judgment which designated the mother, Polly Ann Rutledge, as domiciliary parent of their two children, and ordered him to pay child support. We remand the matter to the trial court for implementation of a specific custody/visitation schedule. In all other respects, we affirm.

FACTS
The parties were married December 15, 1989. Two children were born of this marriage: Mallory, DOB 8/27/92, and John III ("Trey"), DOB 6/7/95. The mother filed suit for divorce in March 2002. She requested primary custody of the children, exclusive use of the family home, and child support.
On April 4, 2002, the court signed an order directing the parents to attend a mandatory co-parent education session and an interview with a psychologist, Dr. E.H. Baker.
On April 5, 2002, the father filed an answer and reconventional demand in which he asserted that he and the mother still lived in the matrimonial domicile. He requested sole custody of the children or joint custody with him being named domiciliary parent. He claimed that the mother was the primary financial support of the family and requested interim periodic spousal support, as well as child support.
Following a conference on April 15, 2002, the court issued an interim order directing the parents to alternate custody on a weekly basis. The mother was awarded use of the family home. Dr. Baker was ordered to evaluate the parents and the children. An order was issued mutually restraining the parents from abusing or harassing each other. As a result of the father's accusation of alcoholism, the mother was directed to cooperate as needed to prove that she was free of alcohol abuse.
On August 22, 2002, the mother filed an answer to the father's reconventional demand in which she asserted that the father lacked the mental suitability to have sole or primary custody of the children. The mother asserted that she had not consumed alcohol since May 2001 and argued that the father's claim that she was incapacitated by alcoholism was inconsistent *310 with his claim that she was the family's primary financial support.
In October 2002, the father filed a motion for judgment of divorce. On November 20, 2002, a judgment of divorce was signed; the provisions of the interim order were continued. The father remarried in March 2003.
On April 15 to 17, 2003, the trial court tried issues of child custody and support. The court found that the parents were immature and did not communicate well with each other. The father was found to have a temper and had problems maintaining continuity of employment; the mother was described by the court as controlling, vindictive, and unwilling to admit any emotional or psychological issues. The court awarded joint custody with an equal sharing of custody, continuing the prior schedule of alternating one-week periods. As to child support, the court accepted the father's worksheet and ordered that the mother pay monthly child support of $420.48. Judgment in conformity with the judge's ruling was signed on September 18, 2003.
On September 23, 2003, the mother moved for a new trial. She complained of several issues including the trial court's failure to consider the stepmother's income in setting child support and Dr. Baker's opinion that the children should be in one home during the school year in determining custody. The trial court granted the new trial to give each parent the right to claim one child as a dependent for tax purposes. In all other respects, the motion for new trial was denied.
In June 2004, the father filed a motion for modification of custody based upon the children's emotional problems and the mother's relationship with a man who allegedly stayed overnight while she had custody. He also requested psychological evaluations of both parents and both children.
In August 2004, the mother answered and reconvened. She alleged instability in the father's household, including a pregnant teenage stepdaughter. In December 2004, the mother filed an amended reconventional demand in which she reported that family therapist Donna George of the YWCA had recommended the children live in one home which the children desired to be the mother's. The mother also asserted that the daughter had called her in November 2004, asking to be retrieved from her father's custody because he had "abandoned" her custody to the mother.
Also in December 2004, a judgment was signed partitioning the community property between the parties. The parties agreed that the father would forego child support as a set-off mechanism against the equalizing payments the father would have owed the mother. In the partition, the mother received the former family home.
A hearing officer conference was held on March 11, 2005. The hearing officer considered the report of Ms. George that the parents had differing parenting styles and that the children had more of a strained relationship with the father. According to Ms. George, the current custody arrangement was not working. While the daughter had emotionally pulled away from her father, Ms. George explained the son felt the need to lie to both parents and was very angry at being "in the middle." Both children expressed to Ms. George the desire to live in one home, and they told her that they preferred to live with the mother. Ms. George opined that the children were unhappy and suffering because of the parents' inability to get along. Finding that the present custody decree had become "very deleterious" to the children due to the conflict between the parents, *311 the hearing officer recommended that the mother be designated the domiciliary parent with the father receiving visitation on alternating weekends and holidays and custody during the summer.
On March 16, 2005, the mother filed a second amended reconventional demand requesting child support should the court award her domiciliary custody. She also filed an objection to the recommendation that the father have summer custody because of his work schedule. On the same date, the father filed an objection to the custody recommendations because they did not meet the heavy Bergeron burden.
On March 17, 2005, the trial court issued an interim order that the hearing officer's recommendations be implemented pending the court's final disposition of issues.
On August 29, 2005, the mother filed a motion for, among other things, the setting of trial and immediate custody, as well as her third amended reconventional demand. She asserted that the father told the daughter that, if she wanted to live with her mother, the girl was not to return to his house. The mother also complained that the father refused to allow her any visitation with the son during the summer and refused to return him at the end of summer; she requested that the father be held in contempt. The court ordered the immediate return of the son to the mother.
In September 2005, following several incidents in which the judge was personally contacted by the father, the paternal grandfather and the parties' 10-year-old son, the court ordered the parties and the children to attend a court hearing. The court informed the parties that no such contact was to occur in the future and that the parties and the children were to comply with the custody plans.
A hearing officer conference was held on December 9, 2005. The hearing officer recommended that the father be held in contempt and ordered to pay $500 in attorney fees to the mother's attorney. He also recommended that the father be ordered to pay child support of $669 per month, retroactive to the date of judicial demand, March 16, 2005. On December 15, 2005, the father filed an objection to the hearing officer's recommendations. By order signed December 21, 2005, the trial court adopted the recommendations as its interim order.
Trial was held over a three-day period in late January and early February 2006. The trial court concluded that the week-to-week arrangement had failed, causing instability in the children's lives. The court found that more factors under La. C.C. art. 134 were in the mother's favor than the father's. The mother was awarded custody during the school year and the father during the summer with the noncustodial parent having visitation. The father was ordered to pay child support of $669 per month retroactive to the date of judicial demand on March 16, 2005. He was also ordered to pay attorney fees of $500 to the mother. The court declined to hold either party in contempt but admonished them about future improper conduct. Each party was directed to bear his or her own costs. Judgment was signed March 11, 2006.
The father appealed, complaining primarily about the mother's designation as domiciliary parent and the retroactivity of the child support award.
The mother answered the appeal. She requested that the trial court judgment be modified to clearly establish the father's summer custody period and to allow her a summer vacation period with the children. She contends that the attorney fees award of $500 was inadequate and that she is *312 entitled to more attorney fees for defending the judgment in what she describes as a "frivolous" appeal.

DOMICILIARY PARENT

Law
The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; Evans v. Lungrin, XXXX-XXXX (La.2/6/98), 708 So.2d 731.
In determining the best interest of a child in custody cases, there must be a weighing and balancing of factors favoring or opposing custody in respective competing parents on the basis of evidence presented in each particular case. Hoskins v. Hoskins, 36,031 (La.App.2d Cir.4/5/02), 814 So.2d 773.
According to La. C.C. art. 134, the relevant factors to be considered in determining the best interest of the child may include the following:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of those factors. The court is not bound to give more weight to one factor over another, and when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. Hoskins v. Hoskins, supra. Moreover, the factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. McIntosh v. McIntosh, 33,908 (La.App.2d Cir.8/31/00), 768 So.2d 219.
The trial court's finding that joint custody is in the best interest of the child does not necessarily require an equal sharing of physical custody. Collins v. Collins, 36,629 (La.App.2d Cir.10/23/02), 830 So.2d 448. Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. Jones v. Jones, 38,790 (La. App.2d Cir.6/25/04), 877 So.2d 1061.
Underlying the trial court's great discretion in child custody cases is its opportunity *313 to better evaluate the credibility of witnesses. Accordingly, the trial court's determination of custody issues is afforded great weight and will not be disturbed on appeal absent an abuse of discretion. Hoskins v. Hoskins, supra.
Regarding the testimony of an expert in a custody matter, after weighing and evaluating expert and lay testimony, the trial court may accept or reject the opinion expressed by any expert. Peacock v. Peacock, 39,950 (La.App.2d Cir.5/4/05), 903 So.2d 506.
The ultimate "best interest of the child" decision remains squarely in the exclusive province of the trial court, a decision which necessarily focuses on all of the evidence and testimony presented. Peacock, supra.

Discussion
Our careful review of the record reveals no abuse of the trial court's discretion in awarding primary domiciliary custody of the children to the mother during the school year.
Both parties sought modification of the alternating week custody arrangement because it proved to be too difficult for the children. Not only did this schedule cause the children great stress, but it became increasingly unworkable due to the lack of communication between the parents. Instead of settling down over time, the level of conflict between the parents apparently escalated and became more traumatic for the children.
The father placed considerable emphasis upon the mother's past alcohol abuse. However, the record is devoid of evidence that the mother has had any alcohol-related problems since she admitted herself for treatment in 2001. The record indicates that she has sufficient support groups within both her church and family. The mother, a software engineer, works at home and is readily available to the children. She is engaged to be married to a man with whom the children generally get along.[1] She lives in the family home where each child has his or her own bedroom and bathroom.
The father has remarried a woman who has two children. His stepdaughter is married and has never lived with her mother. The stepson is about three years younger than Trey and lives primarily with his mother. The father and stepmother have a son of their own who is now about two years old. They live in a four-bedroom house where the father and stepmother have one bedroom and each of the three male children (the son, his stepbrother, and his half-brother) has his own bedroom. When she is at her father's house, the parties' 14-year-old daughter shares a bedroom with her infant half-brother.
The father is currently employed as a railroad signalman. He previously worked for the West Monroe Police Department and he was employed by the Ouachita Parish Sheriff's Office on three separate occasions. He quit all of these law enforcement jobs, usually due to conflict with other officers or because of disciplinary issues. In several reports related to his law enforcement career, the father was described as having an "explosive" temper, being immature and experiencing problems with authority.
The parties have been unable to adequately communicate about the children, and both refrain from contacting the other *314 unless absolutely necessary. In fact, when the father moved, he failed to give the mother his new address and phone number, instead relying upon their daughter to convey this information to the mother.
Each child has experienced strife with the parent of the opposite gender. The daughter felt that the father was unduly critical of her and tended to take out his feelings toward the mother on her, especially when the girl agreed with her mother or held a view similar to her mother's. During the 2004 Thanksgiving holiday, the father became irate with the daughter when she indicated that she did not wish to live with him. He told her to call her mother to come get her and then to wait outside for her arrival. He instructed the daughter to leave and not return to his house. However, he also required her to leave her clothes there. She was sent back to her mother in old clothing that no longer fit her. Since that incident, the daughter has been extremely reluctant to visit or live with her father. She refused to spend the summer with him in 2005.
When the son went to spend the summer of 2005 with his father, the mother was to be allowed weekend visitation. However, the sonwho was only 10 years oldinformed his mother in a telephone conversation that he would not see her again until she signed papers giving his custody to his father. The mother was not allowed to see the child for the entire summer, and the father failed to return him to her at the beginning of the school year. The mother went to the school and retrieved the boy who then ran away, returning to his father's house. The father then kept him out of school for two weeks. The boy was only returned to the mother when the judge threatened to jail the father. When the child first came back to his mother, he was hostile and physically violent toward her. The mother testified that he gradually improved, eventually returned to his "very loving" self.
There were several incidents involving improper contacts with the judge who was assigned to the case at that time. When the judge attended his own child's sporting event, he ran into the paternal grandfather at a playing field. After the men initially shook hands in greeting, the judge described the man as holding his hand in a tight, firm grip for several minutes while he tried to talk to the judge about the case. The judge explained to him that he could not discuss the case, and the man finally released him. While the paternal grandfather denied detaining the judge for the two to three minute period described by the judge, he conceded that he briefly held onto the judge's hand so that the judge would understand that he wanted the judge's "full attention." On another occasion, the judge received two telephone messages from the father. Shortly thereafter, the son telephoned the judge, asking why the judge had placed him with his mother without first asking him about it. The father testified that the boy looked up the judge's phone number on his own but called him in his presence. He also said the boy took off for the playing field where they had previously seen the judge to look for him. The father apparently made no effort to stop the boy from these activities; in fact, he admitted telling him that it was all right to call the judge.
During the course of the divorce proceedings, the children were seen by Donna George, a family therapist, on numerous occasions. She recommended that the alternating week custody schedule be terminated in favor of the children living primarily with the mother during the school year. She concluded that the situation was placing too much stress on the children. It is noteworthy that, early in her interaction with the children, Ms. George *315 accurately predicted the serious problems that the parties' son later manifested with lying.
After the boy returned from spending the summer with his father, he was "totally . . . different," according to Ms. George. He was violent and extremely hostile toward the mother and claimed to not care about her anymore. He told Ms. George that he lied all the time to his mother to "confuse" her and would do whatever it took to make the judge give him to his father. Previously he had been able to talk to Ms. George about what bothered him; he told her he didn't want to talk to her anymore because his father did not want him to do so. In Ms. George's opinion, the boy seemed to have turned against his mother to please his father. He expressed fear that his father would love his stepson more than him. He even told her that his father had threatened to give his things to the other boy if he went to live with his mother. (The daughter had recounted a similar threat by the father to give her things to the Salvation Army.) Ms. George saw improvement in the boy after the judge told him his actions would not affect the custody issue; he seemed relieved and did not feel he had to behave badly anymore to try to force his mother to give him to his father.
Ms. George also saw the parents on a few occasions. She reported that joint sessions to work on the parents' communication skills were unsuccessful, mainly due to the father's inability to put aside his hostility toward the mother. After Ms. George rendered her report recommending that the children live with the mother, the father angrily called and yelled at her. He refused to continue to see her for therapy.
The father hired Dr. Mark Vigen, a psychologist, to see the children without the mother's knowledge. Dr. Vigen particularly noted the strained relationship between the father and the daughter and suggested counseling. When informed of the 10-year-old son's activities in trying to call and go find the judge, Dr. Vigen found those actions "unusual." Dr. Vigen's personality testing of the father suggested that he had an "intellectual oppositionism" that caused him to be overly defensive, to perhaps not listen, to not look for alternatives, and to not clearly understand someone else's point of view before disagreeing with them. However, Dr. Vigen expressed surprise when told about the father's angry call to Ms. George about her report.
The father claimed that the mother's lack of supervision resulted in the son being injured on several occasions, including a four-wheeler accident and an incident when the son received a rope burn when he and other children were playing with a lasso. However, these were minor incidents. The father also accused the daughter of beating up and kicking the son to the point of leaving bruises on him. The daughter freely admitted that she and her little brother had engaged in a kicking, punching, tackling scuffle over the way he treated her puppy; however, she testified that he was not injured in any way and that she had never inflicted bruises on him.
The trial court did not err in concluding that the alternating week schedule was detrimental to the children. The high level of confrontation between the parents, particularly on the father's part, was distressing and stressful. The children's relationship with the father particularly suffered as a result of the chaotic environment caused by this arrangement. The evidence demonstrates that it was in the best interest of the children to modify the custody plan to one in which one parent *316 had domiciliary custody for the school year.[2]
As to the determination of domiciliary custody, the mother appears to have a substantially better relationship with both children. She and the daughter enjoy a relationship devoid of the overwhelming conflict and strife found in the girl's relationship with the father. While the mother and the son have had contentious moments in their relationship, it unfortunately appears that the father has been a major contributing factor in their problems. The daughter's problems with the father emanate from his behavior toward her; likewise, the son's behavioral problems with the mother appear to stem from the father's influence. The mother has also been more involved in the children's schooling, obtaining tutoring for the son when necessary, and in their health care, providing them with dental care which the father dismissed as unnecessary in his opinion. Consequently, we cannot find that the trial court erred in finding that it was in the best interest of the children to designate the mother as the domiciliary parent for the school year.
The father complains of the trial court's use of a checklist in reviewing the factors for determining the best interest of the child under La. C.C. art. 134. While a strictly mechanical use of this checklist could be troublesome, the record shows that in the instant case the trial court gave due consideration to all of the relevant factors and rendered an appropriate custody disposition for the Rutledge children.

Clarification of Custody Dates
Both parties requested clarification of the dates for the school/summer custody periods. The father also requests greater specificity on the times when the children are to be with him. Due to the length of time that has passed since the rendition of judgment and the possibility of changing circumstances, we remand this matter to the trial court on this issue with the following instructions. The trial court is directed to provide for a detailed visitation schedule setting forth specific dates for the school year and summer custody periods. It is also to provide for custody on birthdays and holidays, as well as Mother's Day and Father's Day. In view of the poor relationship between the father and the daughter, who is of an age to have her reasonable preferences considered, the trial court is directed to review the visitation and custody periods she is ordered to spend with the father.

CHILD SUPPORT

Law
An award of child support shall be retroactive to the date of judicial demand, except for good cause shown. La. R.S. 9:315.21. The burden is on the obligor parent to show good cause for not *317 making the award retroactive to the date of judicial demand. Welborne v. Welborne, 29,479 (La.App.2d Cir.5/7/97), 694 So.2d 578, writs denied, 97-1800 (La.10/13/97), 703 So.2d 621, and 97-1850 (La.10/13/97), 703 So.2d 623; Holdsworth v. Holdsworth, 621 So.2d 71 (La.App. 2d Cir.1993). The trial court is vested with much discretion in fixing awards of child support. The court's reasonable determinations shall not be disturbed unless there is a clear abuse of discretion. Curtis v. Curtis, 34,317 (La. App.2d Cir.11/1/00), 773 So.2d 185; Holdsworth, supra.

Discussion
The father argues that the trial court erred in ordering that the child support award against him and in favor of the mother be retroactive to the date of judicial demand. He argues that the award should be retroactive only from September 2005 when the mother had custody of both children. However, the father has failed to articulate good cause for not making the award retroactive to the date of judicial demand. Many expenses associated with the domiciliary parent's care of the children, such as housing and clothing, do not abate during the summer. We find no abuse of the trial court's great discretion in the setting of the child support award.

ATTORNEY FEES
The father contends that, since the trial court failed to follow the hearing officer's recommendation that he be held in contempt, it was inappropriate to award attorney fees of $500 to the mother.
Part of the mother's case against the father involved the enforcement of child visitation with the son during the summer period when the father had custody of the boy. Consequently, we will allow the award of attorney fees to the mother, the prevailing party, to stand pursuant to La. R.S. 9:375.

CONCLUSION
We affirm the court's order that the mother have domiciliary custody during the school year, and remand this matter to the trial court for implementation of a specific custody/visitation schedule pursuant to our instructions as set forth above.
In all other respects, we affirm the trial court judgment. Costs of this appeal are assessed against the father.
REMANDED IN PART; AFFIRMED IN PART.
NOTES
[1] The daughter testified that she gets along well with the man and that her brother got along with him too "most of the time." The mother testified that her fiancé had never spent the night at her home.
[2] At oral argument, counsel for both parents indicated that, since each parent requested modification of the alternating week custody plan, the heavy burden rule of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), was not "on the table." The Bergeron rule states that when a trial court has made a considered decree of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by the change of environment is substantially outweighed by its advantages to the child. However, even if Bergeron, supra, were applicable, we believe that the situation here was sufficiently deleterious to mandate modification. Also, the advantages of stability and reduced confrontation available to the children under a school year/summer plan substantially outweighed any harm to the children.