957 So.2d 318 (2007)
Brian MAYO, Plaintiff-Appellant
v.
Tonya HENSON, Defendant-Appellee.
No. 42,250-CA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 2007.
*319 Loomis & DeMent, by Albert E. Loomis, III, Monroe, for Appellant.
Ronald K. Cook, Monroe, for Appellee.
Before BROWN, CARAWAY and DREW, JJ.
CARAWAY, J.
In this case, the father initiated proceedings against the mother seeking either sole or primary custody of the 3½ year old daughter born out-of-wedlock, claiming that the mother's alcohol abuse impaired her maternal fitness. An older half-sibling lived in the residential home maintained by the mother for 13 years. After the hearing officer designated the father as domiciliary parent, the child moved into his home. The mother objected to the trial court's adoption of the hearing officer's recommendation. Following a six-day trial, the trial court's ruling awarded joint custody and restored the mother's primary custody by naming her domiciliary parent, subject to the father's reasonable visitation. Finding no abuse of discretion in the trial court's judgment, we affirm.

Facts
H.M.M. was born on December 6, 2002, several months after Brian Mayo and Tonya Henson ended their relationship. Brian testified that he abandoned the relationship when Tonya was about 5 months pregnant. Tonya took the infant home to the same dwelling in which she and her then 11-year-old son had lived most of his life. Tonya testified that she paid all of the hospital expenses in connection with H.M.M.'s birth, totaling about $7,500. The child was conceived toward the end of Brian's third marriage to another woman.
After H.M.M.'s birth, Tonya voluntarily allowed Brian periodic visitation. He also paid informal support, but Tonya testified he contributed nothing to defray the costs of her frequent doctor visits and prescription drugs. Brian's visitation schedule consisted of Thursday night through Sunday one week, and Thursday until Friday alternating weeks. He remarried in June 2005, and has a six-year-old stepdaughter.
Brian initiated this action in March 2006, in the wake of Tonya's increasingly problematic behavior generally attributed to alcohol abuse. Tonya's recent convictions for DWI and battery in 2005 resulted in two probated sentences. She was also arrested for DWI in 1991 and battery in 2000. Both fighting incidents involved altercations with women associated with her boyfriends.
At trial, Tonya countered with evidence of Brian's routine use of marijuana and Xanax along with alcohol abuse. Witnesses also testified that Brian had previously sold marijuana.
Tonya and Brian both dropped out of high school and eventually obtained GEDs. *320 Brian operates an auto trim business. His former employment with the fire department ceased in 1995 after a random drug screen evaluation. Tonya left home at 15 when her parents divorced, after being hospitalized for an alleged beating by her father. She has earned some college credit and is self-employed as a medical staffing consultant. Her business, known as "Rad Search," is operated out of her home. Although married briefly at 20, she has no other marriages. She is close to her mother and brothers, and maintains contact with her abusive father. The parties have worked out an informal child support arrangement in which Brian makes indeterminate payments to Tonya. Because he is self-employed, Brian testified that he obtained life insurance coverage naming his mother beneficiary to assuage Tonya's concerns about supporting H.M.M. in the event of untimely death.
Ten witnesses as well as both parties testified at trial, including a mental health expert for each parent, neither of which evaluated the opposing party. Dr. Van Frusha interviewed Tonya and H.M.M. at his office in June 2006, and visited Tonya's home in July, where he observed the interaction among Tonya, the child and the child's half-brother, P.F. He was particularly impressed with P.F.'s school achievements and musical abilities. Dr. Van Frusha characterized the older child as exceptionally bright, even gifted. He described Tonya's interaction with her children as appropriate and loving, and described the connection among them, and the bonding of both children to her. P.F. and H.M.M. were also bonded to each other, and H.M.M. called the older child "brother." P.F.'s testimony as a whole indicated awareness of Tonya's admitted history of alcohol abuse and drug use, but he discounted whether it hampered her mothering ability.
On the other hand, Dr. E.H. Baker testified as Brian's mental health expert. His evaluation was based on reading Tonya's deposition, and he did not personally interview her. He characterized Tonya's house as unstable because her drinking was inappropriate and led to "significant disinhibition," during which she failed to control her anger and hostility. He admitted Tonya reared P.F. successfully and that her "parenting ability is there." He admitted on cross that Brian omitted some unfavorable personal history during their interview.
The trial court questioned Brian and Tonya at length to ascertain the reason each believed one was the better parent. It challenged Brian to be candid about his drug use in light of his positive marijuana screen during the pendency of the custody proceeding, and confronted his "untruthfulness." Although Brian's new wife, Tina, testified that their relationship was good, the trial court was skeptical considering Brian's relationship history which included three marriages ending in divorce. Importantly, Brian and Tina both worked full-time, and had to place H.M.M. in day care. Tonya was a self-described stay-at-home mother. She recalled difficulty communicating with Brian since his remarriage, complaining that Tina interjected herself into the parental dialogue. As for H.M.M.'s hands-on care, Brian testified that he took her to the doctor five to ten times but admitted on cross he was unaware of her 90 doctor visits in three years.[1] He complained that Tonya did not take H.M.M. to the dentist enough, resulting in numerous cavities.
In written reasons, the trial court articulated its factor-by-factor analysis pursuant *321 to Civil Code Article 134 resulting in a ruling for joint custody with Tonya as the domiciliary parent. The details of Brian's custody/visitation schedule are not set forth in the record, but presumably remain similar to the parties' prior arrangement.
Brian appeals the judgment, assigning as error the trial court's application of the best interest of the child standard embodied in Article 134. Brian insists that limited and supervised visitation by Tonya is needed to guard against the risk posed to the child's safety because of Tonya's admitted problems with alcohol.

Discussion
The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; Evans v. Lungrin, 97-541 (La.2/6/98), 708 So.2d 731; Rutledge v. Rutledge, 41,792 (La.App.2d Cir.12/13/06), 945 So.2d 307. In a proceeding in which custody of an illegitimate child formally acknowledged by both parents is sought by both parents, and in proceedings for change of custody after an original award, custody shall be awarded in accordance with the provisions on custody incident to divorce contained in Title V of the Louisiana Civil Code. La. C.C. art. 245. The best interest of the child test under Articles 131 and 134 is a fact-intensive inquiry requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented in each case. Rutledge, supra; Cook v. Cook, 40,572 (La.App.2d Cir.1/25/06), 920 So.2d 981. Each custody case must be viewed within its own peculiar set of facts. Cook, supra.
La. C.C. art. 134 provides that the court shall consider all relevant factors in determining the best interest of the child and such factors may include the following:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The court is not bound to make a mechanical evaluation of all of the statutory factors listed in Article 134, but should decide each case on its own facts in light of those factors. The court is not bound to give more weight to one factor over another, and when determining the best interest *322 of the child, the factors must be weighed and balanced in view of the evidence presented. Rutledge, supra (internal citations omitted). Moreover, the factors are not exclusive but are provided as a guide to the court and the relative weight given to each factor is left to the discretion of the trial court. Rutledge, supra, citing McIntosh v. McIntosh, 33,908 (La.App.2d Cir.8/31/00), 768 So.2d 219.
Underlying the trial court's great discretion in child custody cases is its opportunity to better evaluate the credibility of witnesses. Accordingly, a trial court's determination in the establishment or modification of custody issues is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. Knowlton v. Knowlton, 40,931 (La.App.2d Cir.4/12/06), 927 So.2d 640; Cook, supra; Walkowiak v. Walkowiak, 32,615 (La.App.2d Cir.12/8/99), 749 So.2d 855; Warlick v. Warlick, 27,389 (La. App.2d Cir.9/29/95), 661 So.2d 706.
In the ruling and its questioning of the parties, the trial court conscientiously and laboriously considered the factors listed in Civil Code Article 134 for its determination of the best interest of the child. It found that the majority of the factors favored primary custody in Tonya. Sadly, however, because of the drug and alcohol abuse of both parents and their history of poor relationships with persons of the opposite sex and/or former spouses, the trial court concluded regarding the parents' "moral fitness" factor that it "was equally `bad' for each party." The illegal drug and alcohol problems of both parents have not yet precipitated intervention by state authorities, through criminal incarceration and action by the Department of Social Services, which could resolve custody of the child by removing the parents altogether. The court was therefore required to rule on custody with knowledge of these major failings of both parents which may harm the well-being of the child in the future.
With this "equally bad" backdrop, Brian's appeal primarily rests on a re-emphasis of Tonya's alcohol abuse, her brushes with the law caused by that abuse and her frequent and failed relationships. However, more damning is the course of events that elapsed after Brian's initiation of this action in March 2006, revealing his own drug problem. In his deposition of April 22, 2006, Brian denied the use of marijuana since his removal from the Monroe Fire Department in 1995. Leading up to the hearing officer conference of May 23, 2006, Brian refused Tonya's request to submit to hair follicle drug testing. After the conference, the hearing officer recommended that both parents be subjected to drug testing and this recommendation became the order of the trial court on June 6, 2006. Two days later, Brian tested positive for marijuana use. At trial, he also admitted use of Xanax and ecstasy. With this direct evidence of Brian's use of illegal drugs, the trial court could easily credit the testimony of other witnesses regarding Brian's distribution and sales of those drugs.
Accordingly, while Brian's emphasis of the alcohol abuse and possible alcoholic condition of Tonya is noted in this appeal, the trial court was called upon to weigh the equally disturbing evidence of Brian's drug abuse. The court's decision leaving custody of H.M.M. primarily with Tonya ultimately rested on the strength of Tonya's previous exercise of the care and rearing of the child since birth, the desirability for maintaining continuity of that custodial environment, and the success of Tonya's existing family unit demonstrated by the character and educational strengths of her older son, P.F. The trial court's rulings on those important factors support its judgment *323 of joint custody with Tonya's designation as domiciliary parent.

Conclusion
For the above reasons, the ruling of the trial court is affirmed. Costs are assessed to appellant.
AFFIRMED.
NOTES
[1] H.M.M. allegedly suffers from RDS, a chronic respiratory disorder.