996 So.2d 364 (2008)
Gary JONES, Plaintiff-Appellee
v.
Wilson WILLIS and Lam Willis, Defendants-Appellants.
No. 43,608-CA.
Court of Appeal of Louisiana, Second Circuit.
September 17, 2008.
*365 David C. Hesser, Melissa L. Benoit, Alexandria, for Defendants-Appellants.
*366 Teresa Culpepper Carroll, Jonesboro, for Plaintiff-Appellee.
Before BROWN, STEWART and GASKINS, JJ.
GASKINS, J.
In this custody dispute, the maternal grandparents appeal from a trial court judgment awarding custody of their late daughter's eight-year-old son to the stepfather who has raised the boy since he was two years old. We affirm.

FACTS
Bernice Willis had three children: Christa (born in 1993), Tianna (born in 1995), and Jimmy (born in June 2000). Each child had a different father; Jimmy's father is Jerald Ashton.[1] Bernice and the children lived with her parents in North Carolina. On June 4, 2002, Bernice married Gary Jones; this was her only marriage. Thereafter, Bernice and Gary lived in Winn Parish in Louisiana with Tianna and Jimmy. Christa, who had been adopted by the maternal grandparents, came to live with them for two periods of time which amounted to less than two years.
Bernice, who had lupus, died October 12, 2007. On October 16, 2007, Gary filed a petition seeking custody of Jimmy. Named as defendants were the maternal grandparents, Wilson and Lam Willis, who live in North Carolina. According to the petition, the grandparents had announced their intent to keep the boy in North Carolina with them after a memorial service for Bernice; therefore, Gary requested temporary custody of the child pending a hearing. Gary also asserted that Jimmy's biological father was agreeable to his having legal custody of the boy and eventually adopting him. The trial court granted Gary temporary custody and set the matter for hearing.
The matter was tried on October 31 and November 2, 2007. On October 31, 2007, the grandparents filed a petition of intervention on behalf of Christa, asserting that she wished to intervene because she had a "fundamental liberty interest in preserving the family unit with her grandparents."[2] The trial judge stated in open court that he would accept this pleading.
On November 2, 2007, the second day of the hearing, the grandparents filed a petition for custody and tutorship and an accompanying memorandum. They alleged that custody of Jimmy should be awarded to them because they already had custody of his sister Christa and were suitable relatives with whom he had previously lived. They further contended that due to their daughter's death, Gary was no longer Jimmy's stepfather and thus not a relative under La. Ch. C. arts. 622 and 683.[3] As to Jimmy's biological father, they asserted that since their daughter was awarded custody of Jimmy when his parents divorced, Jerald had no legal authority to appoint Gary as the child's tutor.[4] The grandparents *367 maintained that they should be named Jimmy's tutors pursuant to La. C.C. art. 263. In open court, the trial judge stated that he would not receive any petitions filed during the course of the proceeding; however, he accepted the memorandum.
During the hearing, Gary testified that he and Jimmy had a close, loving father/son relationship. Although his current employment involved working on oil derricks, he had arranged for his father and stepmother to care for Jimmy when his job required him to be absent. He expressed a willingness to find a job closer to home if he was awarded custody of Jimmy. He and Jimmy lived in a trailer that had a living room, a kitchen, three bedrooms, and two bathrooms. While Jimmy was repeating the first grade, Gary testified that his grades and conduct had improved in the current school year and that he communicates with Jimmy's teacher. Gary stated that he was about to sign Jimmy up for speech therapy at school for a speech impediment. He admitted spanking Jimmy with his hand or a belt but insisted that he had never left marks on the child. He also testified that he resorted to corporal punishment when taking away toys and imposing time-outs failed. He stated that he had intended to adopt Jimmy before Bernice's death, but the matter had not been pursued due to Bernice's ill health and hospitalizations.
Among other witnesses, Gary presented the testimony of his own former wife, who stated that she had no recent contact with him; however, during their marriage, her nieces and nephew had come to live with them and Gary had helped her provide them with a loving home.[5] Sergeant Jerald Ashton, Jimmy's biological father, also testified for Gary, stating that he wished him to have custody of Jimmy and verifying that he had signed papers to release the boy to be adopted by Gary. Jerald also recounted that he did not want the maternal grandparents to have custody, citing an incident when the grandfather physically struck him and Bernice when she told him that she was pregnant with Jimmy. Gary's father and stepmother testified about their love for Jimmy as their grandson and their willingness to help Gary care for him.
The maternal grandparents emphasized that Bernice and her children lived with them in North Carolina until her marriage to Gary when Jimmy was two years old. After moving to Louisiana, Bernice and her family came to visit them at Thanksgiving and Christmas and during the summer. However, the grandparents testified that they never visited their daughter in Louisiana because she did not want them to do so. They both admitted that about two years before the court proceedings they were separated for at least a year.[6] The maternal grandmother testified that she, like Bernice, has lupus.
The maternal grandparents also testified that they have a four-bedroom, two-bathroom house surrounded by a large yard and that the grandmother does not work outside of the home. Additionally, the grandparents stated that they would arrange for Jimmy to have a private speech therapist to work on correcting his speech impediment. The grandfather denied ever *368 striking Bernice and insisted that he hit Jimmy's father for not caring about the child.
Christa testified on behalf of her grandparents. She stated that she was not close to her mother and that she did not like Gary. However, she said she was close to her grandparents and to her two half-siblings. As to the periods when she was in Louisiana with her mother and Gary, she testified that they lived in a trailer that had problems with its generator and septic tank; the generator problems sometimes resulted in inadequate air conditioning, which aggravated Bernice's lupus. (Gary, on the other hand, testified that these housing issues were of short duration.)
Christa testified that her mother and Gary argued a lot and that he once struck Bernice after she slapped him. (Gary admitted this incident but insisted that after Bernice slapped him, he only "glanced" her shoulder in reaction. Additionally, he stated that the incident arose when Bernice tried to leave with the children; he took the car keys from her because she was in no condition to drive.) Christa testified that the police had come to her mother and Gary's residence between five and 10 times for domestic disturbances; she named the responding officers as Deputy Jeremy Underwood of the Winn Parish Sheriff's Office and Pat Ashley, the Dodson police chief. However, when these officers testified, each recounted only one such incident. According to the officers, both incidents involved minor arguments and no charges were filed.
Christa stated that on several occasions Gary "whipped" her with his hand, a belt or a switch. The one incident involving a switch arose from her breaking a window with a stick after Gary told her to not throw sticks near the house. Gary testified that she "got up in [his] face" and started screaming and hollering; she admitted telling Gary that she hated him. She also testified that Gary once whipped Jimmy hard enough to cause bruises.
On December 14, 2007, the trial court rendered written reasons and judgment. It found that it was in the best interest of the child to continue in the custody of his stepfather, with whom he was bonded and had "an extremely close relationship." The court specifically observed that the stepfather was the only father that the boy had known for five years. While acknowledging the maternal grandparents's love for Jimmy, the court likewise found that the stepfather and his parents had great love for the child. Among other things, the court noted Bernice's conflicts with the maternal grandfather, which resulted in the grandparents having an "insignificant relationship" with Jimmy for the past five years. The court also mentioned the grandparents' marital problems and their "adverse relationship" with Jerald, who testified that he wanted his son to remain with Gary.
The maternal grandparents appeal.

TUTORSHIP

Law
Upon the death of either parent, the tutorship of minor children belongs of right to the other. La. C.C. art. 250.
La. C.C. art. 256, which pertains to illegitimate children, provides:
A. The mother is of right the tutrix of her illegitimate child not acknowledged by the father, or acknowledged by him alone without her concurrence.
B. After the death of the mother, if the father had not acknowledged the child prior to the mother's death, the court shall give first consideration to appointment as tutor either of her parents or *369 siblings who survive her and accept the appointment, and secondly, the father, always taking into consideration the best interests of the child.
C. If both parents have acknowledged their illegitimate child, the judge shall appoint as tutor the one by whose care the best interests of the child will be served. However, if the parents are awarded joint custody of such acknowledged illegitimate child, then the cotutorship of such child shall belong of right to both parents, with equal authority, privileges, and responsibilities, unless modified by order of the court or by an agreement of the parents, approved by the court awarding joint custody.
The right of appointing a tutor, whether a relation or a stranger, belongs exclusively to the father or mother dying last. La. C.C. art. 257.
The father or mother who is entitled to the tutorship of the illegitimate child, according to the provisions of La. C.C. art. 256, can choose a tutor for him, whose appointment, to be valid, must be approved by the judge. La. C.C. art. 261.
When a tutor has not been appointed to the minor by father or mother dying last, or if the tutor thus appointed has not been confirmed or has been excused, then the judge shall appoint to the tutorship, from among the qualified ascendants in the direct line, collaterals by blood within the third degree and the surviving spouse of the minor's mother or father dying last, the person whose appointment is in the best interests of the minor. La. C.C. art. 263.
Custody and tutorship are not necessarily the same thing, and, although the appointment of a custodian and a tutor affect each other, the two proceedings are independent of each other. In the Matter of the Custody of Booty, 95-0828 (La.App. 1st Cir.11/9/95), 665 So.2d 444; Knisely v. Knisely, XXXX-XXXX (La.App. 3d Cir.3/1/06), 924 So.2d 423.

Discussion
In seeking custody, the maternal grandparents invoke the tutorship articles in the apparent belief that these give them preference over the child's stepfather. In particular, they rely upon La. C.C. art. 263. However, since the biological father is not dead, this article is inapplicable. In re E.D.B., 98-0743 (La.App. 4th Cir.9/30/98), 719 So.2d 666. Additionally, it does not give preference to ascendants. In re E.D.B., supra. It only requires that a court look first to a close relative before considering a stranger. Succession of Wetmore, 422 So.2d 726 (La.App. 4th Cir. 1982), writ denied, 429 So.2d 133 (La. 1983); Lavallais v. James, 559 So.2d 998 (La.App. 3d Cir. 1990). The article includes a surviving stepparent who was married to the parent dying last in the list of close relatives.
The evidence in this record indicates that Bernice and Jerald were never married; consequently, the child is illegitimate. Therefore, contrary to the maternal grandparents' assertion, La. C.C. art. 258,[7] *370 an article pertaining to the right of appointment of a tutor when the parents are divorced or judicially separated, is inapplicable.
There is no evidence demonstrating whatif anytutorship or custody award was ever made as to Jimmy during his mother's lifetime. Jerald's unrefuted testimony established that he acknowledged paternity of the boy and paid child support. Therefore, La. C.C. art. 256(B), which gives maternal grandparents of an illegitimate child "first consideration" to be appointed the child's tutor, appears to be inapplicable.
We note that the trial court made no specific mention of the child's tutorship in its written opinion or judgment. Furthermore, there is no indication of an estate requiring administration on the boy's behalf.
In awarding custody, the court merely considered the testimony of the biological father, who had a right to seek the child's custody, that he was satisfied with the child being in the stepfather's custody. Such consideration was not improper.

CUSTODY

Law
The best interest of the child is the guiding principle in all child custody litigation. Street v. May, 35,589 (La.App. 2d Cir.12/5/01), 803 So.2d 312.
Custody awards to nonparents are governed by La. C.C. art. 133, which provides that, if custody is not to be awarded to either parent, "the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment." Street v. May, supra; Knisely v. Knisely, supra.
La. C.C. art. 134 governs the determination of the best interest of the child; it states:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.

*371 (12) The responsibility for the care and rearing of the child previously exercised by each party.
The best interest of the child test is a fact-intensive inquiry requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented in each case. Street v. May, supra; Knisely v. Knisely, supra.
The determination of the trial court in child custody matters is entitled to great weight, and this discretion will not be disturbed on review in the absence of a clear showing of abuse. AEB v. JBE, 1999-2668 (La.11/30/99), 752 So.2d 756; Knisely v. Knisely, supra. Underlying the trial court's great discretion in child custody cases is its opportunity to better evaluate the credibility of witnesses. Rutledge v. Rutledge, 41,792 (La.App. 2d Cir.12/13/06), 945 So.2d 307.
The separation of children in a family is a custodial disposition that courts seek to avoid; when feasible, a court should shape its orders to maintain family solidarity. Howze v. Howze, XXXX-XXXX (La.5/26/99), 735 So.2d 619; Street v. May, supra.

Discussion
Although the trial court concluded that all of the factors relevant to Jimmy's best interest were in Gary's favor, the maternal grandparents emphasize certain factors which they contend weigh in their favor. However, our review of the record does not support their contentions.
Notably, they made allegations of abuse against Gary, claiming that he physically abused Bernice, Christa and Jimmy. The only evidence supporting these allegations was the obviously biased and exaggerated testimony of Gary's admittedly hostile stepdaughter Christa. During her testimony, she made no effort to conceal her dislike for Gary. Each of the two law enforcement officers she claimed had been called to Gary and Bernice's home on several occasions testified that he had been to the residence on one occasion for a minor matter. Christa conceded that she never reported any alleged abuse to school officials. Gary admitted disciplining the children with corporal punishment but denied doing so to the point of leaving marks on them. He also frankly discussed his arguments with Bernice and their one physical confrontation, wherein he almost hit her after she first struck him. This occurred during an incident when Bernice was trying to leave with the children; Gary took the car keys away from her because he did not believe that she was in any condition to drive. He testified that he feared that she would endanger herself and the children.
The maternal grandparents also claim neglect by the stepfather on the basis of Christa's testimony about the family's living condition. While there were septic tank and electricity issues at one point in time, Gary testified that these matters were resolved within a short period of time. His father and stepmother, who lived about one mile away, corroborated his testimony about these issues. They also testified about their roles in assisting Gary in caring for Jimmy. When Bernice was still alive, they helped with the children when she was ill or in the hospital. Now they look after Jimmy when Gary is working offshore. However, the testimony showed that when Gary is home, he takes care of the boy himself.
The maternal grandparents assert that Gary is responsible for Jimmy's poor school performance and speech impediment. However, they fail to acknowledge that Jimmy's school struggles occurred while their daughter Bernice was still alive *372 and her health was declining. Gary testified that Jimmy was repeating the first grade; while he was doing well in some subjects, he was experiencing difficulty with math. He testified that the teacher had suggested that he work with Jimmy at home but had not suggested a tutor. As to the boy's speech impediment, the stepfather testified that he was in the process of signing Jimmy up for the speech therapy provided by the school system. He was following the recommendation of the school system; they had not suggested that he needed to hire a private therapist for the child.
The maternal grandparents argue that they should be awarded custody of the boy because they already have custody of his now 15-year-old half-sister, Christa. However, the testimony indicated that eight-year-old Jimmy was actually closer to his other half-sister, 12-year-old Tianna. She and Jimmy both moved to Louisiana in 2002 when their mother married Gary. Tianna remained here until Bernice's death in 2007, at which time she went to live with her father in North Carolina. In contrast, Christa only lived in Louisiana for less than two of the five years that the other children lived here as a family with their mother and Gary. Tianna currently lives 300 miles from the maternal grandparents. Gary testified that he has continued to maintain a close relationship with Tianna and that her father is willing to allow him to visit her at any time. While the maternal grandfather testified that he was willing to drive Jimmy to see Tianna, the record is silent as to the current relationship between the maternal grandparents and Tianna's father.[8]
It is unfortunate that as a result of their mother's death, Jimmy will never again have the opportunity to live in a family unit with both his half-sisters. However, Gary has demonstrated not only his willingness but also his ability to facilitate Jimmy's relationship with the sister to whom the boy is closer in affection and age.
We agree with the trial court's conclusion that the La. C.C. art. 134 factors weigh heavily in Gary's favor. To the extent that the trial court was required to make credibility determinations, it is evident that they were made in favor of Gary and his witnesses. While all parties obviously love the child, the evidence supports a finding that the child has been living in a wholesome and stable environment with Gary and that he should continue to do so.
Therefore, after a close examination of the record, we find no manifest error in the trial court's determination that Jimmy's best interest is served by remaining in the custody of the stepfather with whom he has been living since he was two years old.

CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are assessed to the appellants, Wilson and Lam Willis.
AFFIRMED.
NOTES
[1] In the record, the biological father's name is spelled "Gerald." However, it is spelled "Jerald" on Jimmy's birth certificate.
[2] The grandparents had adopted Christa several years before Bernice died; at the time of Bernice's death, she was living with them in North Carolina. After Bernice's death, Tianna went to live with her father in North Carolina.
[3] The maternal grandparents also cited these articles in their brief to this court. They pertain to child in need of care proceedings and are inapplicable to this custody proceeding.
[4] Despite the petition's allegation that Jerald and Bernice were divorced, the testimony of the maternal grandfather established that Bernice's only marriage was to Gary.
[5] The ex-wife was originally subpoenaed by the grandparents. When they declined to call her as a witness, Gary did so. She denied any domestic violence in the marriage. Gary admitted being arrested for violating a restraining order as the result of entering a store as she exited it; the charges were dropped.
[6] In her testimony, Christa adamantly insisted that the grandparents had not separated, instead claiming that the grandmother had visited a relative out of loneliness.
[7] This article provides:

If the parents are divorced or judicially separated, only the one to whom the court has entrusted the care and custody of the children has a right to appoint a tutor for them as provided in Article 257. However, if the parents have been awarded joint custody of the children, then the right to appoint a tutor for them belongs to the parent dying last, but either parent may appoint a tutor of the property of the children as provided in Article 257. In the event that both parents appoint a tutor of the property of the children, the tutors shall separately administer that portion of the children's property which is attributable to the respective parent's estate. The court shall decide which tutor shall administer that portion of the children's property which is not attributable to either parent's estate.
[8] As to Tianna's father, the maternal grandfather's testimony established only that there was a custody dispute between Bernice and Tianna's father at some point which resulted in the grandfather having to get rid of a family dog that had attacked Tianna and inflicted injuries requiring 85 stitches. The maternal grandmother testified that she did not intend to seek custody of the girl because she had a father.