ROSEMARY LEDET, Judge.
b This is a contentious child custody case. From a judgment awarding shared joint custody — week-on, week-off, 50-50 time with each parent — and designating neither party as domiciliary parent, the mother, Ann Hanks (“Ann”), appeals. The father, Raymond Hanks, Jr. (“Ray”), answers the appeal. For the reasons that follow, we affirm the award of shared joint custody, but remand to the trial court with the following instructions: (i) to revisit the domiciliary parent issue under La. R.S. 9:335(B); (ii) to issue a joint custody implementation order under La. R.S. 9:335(A); and (in) to consider appointing a parenting coordinator under La. R.S. 9:358.1-9:358.9.

FACTUAL AND PROCEDURAL BACKGROUND

On October 7, 2005, Ann and Ray were married. Thereafter, the parties established their matrimonial domicile in Plaquemines Parish. Two children were born or adopted of the marriage — EH (date of birth, October 24, 2004); and ZH (date of birth, April 2, 2007).[1] On November 22, 2010, Ann filed a petition for ^divorce. In her petition, she requested that the parties be awarded joint custody, that she be designated domiciliary parent, and that Ray be granted reasonable visitation. On December 4, 2010, her petition was served on Ray. On that same date, an emotional event occurred and the parties physically separated.[2]
On December 8, 2010, Ray filed a Petition for Protection from Abuse and Temporary Restraining Order. In his petition, *211 he made the following allegations of the facts and circumstance of the abuse:
December 4, 2010 — “She [Ann] grabbed me by the neck and placed a knife to my neck and threatened to kill me. She had made numerous threats like this in the recent weeks but previously had not used a weapon. She suffers dramatic mood swings and is totally unpredictable. She then told me she had consumed a quantity of drugs to kill herself. The police were called to the scene. She admitted to police she was both homicidal and suicidal. She admitted to me that she was a having an affair with an unknown male. She was taken to River Oaks for a psychological evaluation and is presently still in that facility. I fear she will return home and be even more violent if she is released from River Oaks after 72 hours.
|sAs a result of the above petition, Ray obtained a Protective Order. Under the Protective Order, Ray temporarily obtained custody of the children and use of the marital home.
On December 14, 2010, Ann filed an Answer to Petition for Protection from Abuse and Motion for Sanctions and Costs and Reconventional Demand. In her answer, Ann alleged that Ray’s allegations of abuse constituted perjury and were a misuse of the judicial system.
On December 15, 2010, the trial court held a hearing on the “Petition for Domestic Relief in Reconvention.” Following a pre-trial conference, the trial court noted on the record that the parties reached an interim consent judgment. See La. C.C. art. 3071 (stating that “[a] compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship.”) The interim consent judgment, which was reduced to judgment on March 2, 2011, provided as follows:
• This Judgment is an Interim [Order] and [a] Stipulation Without Prejudice to either party.
• The Protective Order issued herein is dismissed with prejudice.[3]
• The parties shall have joint and shared legal custody of the minor children and shall alternate custodial access with the minor children on Mondays picking the children up at school or the maternal grandmother’s residence. Mother shall deliver the children to Father on Monday; Father shall have LChristmas Eve at 6:00 o’clock p.m. until 11:00 o’clock a.m. Christmas Day; Mother shall have Christmas Day from 11:00 o’clock a.m. until Sunday at 11:00 o’clock a.m. with the parties then alternating on a week to week basis on Mondays.
• Mother shall exercise her custodial access with the children at her Mother’s residence (Mary Klein).[4]
*212 • Raymond Hanks shall have the exclusive use of the family residence, shall be responsible for the mortgage payments for the residence, and reserving his right to claim reimbursement for mortgage payments.
• Ann Hanks shall reside at her Mother’s home and reserves her right to request rental reimbursement from Raymond Hanks.
• The parties shall both present to Professional Drug Testing today for hair follicle drug testing.[5]
• Raymond Hanks shall return the cell phone used by Ann Hanks to her mother’s residence today.[6]
• The parties shall participate in counseling/mediation with Dr. Morris, reserving their requests to seek the appointment of a mental health professional to perform a custody evaluation if needed.
• The parties shall return to court on the 1st day of March, 2011 at 9:30 o’clock a.m. for review of custody and determination of domiciliary status.[7]
{¡•The parties shall communicate with each other by telephone or emails only.
• Permanent injunctions are granted herein, immediately and without bond, to each and both of the parties, Raymond Paul Hanks, Jr., and Ann Marie Hanks, individually and mutually enjoining them from any form of verbal or physical harassment of the other party, from going within 100 yards of the residence or place of employment of the other party, and from communicating in any manner whatsoever other than by text messages and emails which shall be limited to concerns related to the minor children.
On January 14, 2011, Ray filed an Answer and a Reconventional Demand to the Petition for Divorce. He represented that the children had been in the care, custody, and control of both parents since birth. He requested that the physical custody of the children be shared equally under La. R.S. 9:355 with a Joint Implementation of Custody Plan being filed with the Court clarifying the parties’ parental rights and designating a proper schedule for each party’s physical care of the children, including holidays and summer vacation periods.
On March 3, 2011, Ray filed a Motion to Reset Hearing for Appointment of Evaluator and Rule for Contempt. In his motion, he alleged that Ann’s text messages and emails “have been constant throughout *213 each day and rise to the level of harassment.” He also alleged two instances in February 2011 in which Ann allegedly violated the injunction by coming within 100 yards of his residence. He noted that on one occasion his neighbors and mail carrier witnessed Ann taking mail from the residence. On the other occasion, Ann sent someone, without informing him, to paint house numbers on the curb.[8]
On May 3, 2011, the parties agreed to the appointment of Dr. Susan Niemann-Hightower, LPC, LMFT (“Dr. Niemann”) to perform a custody | ^evaluation. The parties requested that home visits occur.[9] The parties further agreed to split the costs of the evaluation. On October 23, 2011, Dr. Niemann issued her report.[10] In her report, Dr. Niemann’s recommendation was as follows:
Week-on, week off, 50-50 time with Ray Hanks designated domiciliary parent. While each home is completely appropriate as it stands today, Ray is independently able to provide this environment, while Ann’s history suggests that independence is not a certainty for her in the near future. Mary Klein [the paternal grandmother] is not petitioning the court for domiciliary custody.[11]
|7On February 7, 2012, a hearing was held at which the trial court set a trial date of May 7, 2013 and ordered that “all Judgments and Interim Orders shall remain in effect with the exception of the following” *214 three provisions:[12]
1. The requirement that Ann reside in her mother’s home was lifted; however, it was ordered that her mother [Mrs. Klein] be permitted to continue to assist her in caring for the children.
2. The requirement that Ann exercise her custodial access with the children at her mother’s residence was lifted and no longer required.
3. The permanent injunction prohibiting the parties from any form of harassment and going within 100 yards of the residence or place of employment of the other party or from communicating in any manner other than text messages and emails was modified to read: “IT IS FURTHER ORDERED, ADJUDGED AND DECREED that neither party shall harass or abuse the other in any manner whatsoever and all communications shall be regarding the minor children.”[13]
On February 14, 2012, a judgment of divorce was rendered. The divorce judgment stated that “all prior Judgments shall remain in full force and effect.”
On March 21, 2012, Ann filed a Motion to Reset Issues Contained in Petition for Divorce Which Were Continued. Among those issues she requested be reset was her request for joint custody with her designated as domiciliary parent.
A four-day trial was held on May 7, 8, 15, and 17, 2012. At trial, the following eight witnesses testified: Ray; Ray’s father, Raymond Hanks, Sr. (“Ray, Sr.”); the custody evaluator, Dr. Niemann; Ann; Ann’s mother, Mary Klien; Ann’s stepfather, Claude Klien; a family friend, Ricky Becnel, Jr.; and Ann’s friend, Barbara Mula. At the close of the evidence, the trial court took the matter under advisement.
|sOn June 27, 2013, Ann filed a Motion for Status Conference, seeking to discuss the status of the judgment that was taken under advisement from the May 2012 trial. On the following day, Ann’s motion was denied and a judgment was rendered. In the judgment, dated June 28, 2013, the trial court “awarded shared custody of the minor children,” and provided that the parties “shall alternate custodial access with the minor children as previously agreed in the Interim Order stipulated in open Court on December 15, 2010 signed on March 2, 2011.” This appeal followed.

STANDARD OF REVIEW

In child custody cases, the following principles are well-settled:
• Appellate courts will not disturb a trial court’s custody award absent a manifest abuse of discretion, Leard v. Schenker, 09-1438, pp. 2-3 (La.App. 4 Cir. 3/24/10), 35 So.3d 1152, 1154 (citing Revision Comments-1993 to La. Civ. Code art, 134, Comment (b) (noting the traditional rule that “a trial court’s custody award will not be disturbed absent a manifest abuse of discretion” and collecting cases)).
• In most child custody cases, the trial court’s rulings are based heavily on its factual findings. Palazzolo v. Mire, 08-0075, pp. 34-37 (La.App. 4 Cir. 1/7/09), 10 So.3d 748, 768-70 (citing Richardson v. Richardson, 07-0430 (La.App. 4 Cir. 12/28/07), 974 So.2d *215 761). “[A] court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of ‘manifest error’ or unless it is ‘clearly wrong.’ ” Evans v. Lungrin, 97-0541, 97-0577, p. 6 (La.2/6/98),708 So.2d 731, 735 (citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989)).
• “[E]ach child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount goal of reaching a decision that is in the best interest of the child.” McCormic v. Rider, 09-2584, pp. 3-4 (La.2/12/10), 27 So.3d 277, 279 (citing Barberousse v. Barberousse, 556 So.2d 930 (La.App. 3 Cir.1990)); see La. C.C. art. 131 (providing that “the court shall award custody of a child in accordance with the best interest of the child.”)
• In determining the best interest of the child, “[e]ach case must be viewed in light of the child’s age, the situation of the parents, and any other factor relevant to the particular case.” Palazzolo, 08-0075 at p. 35, 10 So.3d at 768, (citing White v. Kimrey, 37,408, p. 7 (La.App. 2 Cir. 5/14/03), 847 So.2d 157, 161).
• To aid courts in making this factual determination, La. C.C. art. 134 enumerates twelve factors for the court to consider. These factors have been construed to be nonexclusive, and the trial court has the discretion to determine the relative amount of weight to be given each factor. The court is not required to analyze mechanically all of the dozen factors; rather the court should balance and weigh the factors in view of the evidence presented. Palazzolo, 08-0075 at pp. 34-37, 10 So.3d at 768-70.
• The best interest of the child standard — codified in La. C.C. arts. 131 and 134 — is “a fact-intensive inquiry requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented in each case.” Lannes v. Lannes, 07-0345, p. 4 (La. App. 4 Cir. 2/13/08), 977 So.2d 1119, 1121 (citing Rutledge v. Rutledge, 41,-792 (La.App. 2 Cir. 12/13/06), 945 So.2d 307; and Cook v. Cook, 40,572 (La.App. 2 Cir. 1/25/06), 920 So.2d 981).
• “Because the trial judge is in the best position to ascertain the best interest of the child based on the particular circumstances of the particular case, the trial court’s custody determination is entitled to great weight and will not be disturbed by an appellate court absent a clear showing of abuse of discretion.” Palazzolo, 08-0075 at p. 35, 10 So.3d at 768; McKenzie v. Cuccia, 04-0112, pp. 3-4 (La.App. 4 Cir. 6/23/04), 879 So.2d 335, 338 (citing Thompson v. Thompson, 532 So.2d 101 (La.1988)); Foshee v. Foshee, 12-1358, p. 4 (La.App. 4 Cir. 8/28/13), 123 So.3d 817, 820; Watts v. Watts, 08-0834, p. 2 (La.App. 4 Cir. 4/8/09), 10 So.3d 855, 857.

DISCUSSION

On appeal, Ann raises the following three assignments of error:
1. The Trial Judge erred in finding that the current shared custody agreement has caused no continuing or recurring problems, in accordance with La. C.C. art. 134(4) — “[t]he length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.”
2. The Trial Judge erred in finding that Raymond Paul Hanks, Jr. has the willingness and ability to facilitate a close and continuing relationship between the children of the marriage and Ann Marie Hamann *216 Hanks, as set forth in La. C.C. art. 134(10) — “[t]he willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.”
|in3. The Trial Judge erred in finding that no domiciliary should be designated, as set forth in La. R.S. 9:335.[14]
The parties agree that they should have joint custody. Ann contends that the trial court erred in failing to designate her as domiciliary parent and grant Ray reasonable visitation. Ray counters that the trial court’s decision awarding shared joint custody with no designated domiciliary parent was not an abuse of discretion and thus should be affirmed. The issues presented on appeal are thus limited to the following two: (i) whether the trial court erred in ordering that the existing shared joint custody arrangement — a week-on, week-off, 50-50 schedule — be maintained; and (ii) whether the trial court erred in declining to designate a domiciliary parent.[15] Both of these issues are governed by the best interest of the children standard.
I^To provide a background for analyzing these two issues, we summarize the trial court’s and the custody evaluator’s statements regarding each of the Article 134 factors used to make a best interest determination. Specifically, the trial court, in its reasons for judgment, and Dr. Niemann, in her report, addressed the application of each of the factors as follows:
1. The love, affection, and other emotional ties between each party and the child:
■ The trial court noted that both parents have established that they each have love, affection and substantial emotional ties with their two children.
*217 • Dr. Niemann noted that both parents have established that they each have love, affection, and substantial emotional ties with their two children.

2. The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child:

• The trial court noted that there was no evidence that either party lacked the capacity or disposition to give their children love, affection, and spiritual guidance and to continue the education and rearing of the two children.
• Dr. Niemann noted that both parents have the capacity and disposition to provide these things.
3. The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs:
■ The trial court noted that the evidence shows that both parents are employed and that Mr. Hanks earns a higher monthly income than Mrs. Hanks. Mr. Hanks also has the more stable work history of the two parties.
|1⅞- Dr. Niemann noted that Ray is a well-employed professional in a supervisory position; he has a strong work ethic and a solid history of employment. Ann’s history is uneven. She is currently employed part time. She is dependent upon her parents and has no definitive plan for independence.
4. The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment:
■ • The trial court noted that the children have been living under the custody arrangement without a designated domiciliary parent as stipulated to in the Interim Order for more than two years, and neither party presented evidence that this arrangement has caused any continuing or recurring problems.
• Dr. Niemann noted that Ray [is] in the family home, and since the separation, the children have followed a schedule sharing time between his home and Ann’s family home. While the children struggled with this arrangement at first, they seem to be reasonably adjusted to this at this time.
5. The permanence, as a family unit, of the existing or proposed custodial home or homes:
• The trial court noted that Mr. Hanks lives in the former matrimonial domicile. The children stay at the home of Mrs. Hanks’ parents when it is her custody week. Mrs. Hanks lived at her parents’ home for a period of time after she separated from Mr. Hanks, but she now lives in a nearby apartment. Mrs. Hanks’ parents live a few blocks from Mr. Hanks.
• Dr. Niemann noted that both homes would seem to be stable and reasonably permanent.
6. The moral fitness of each party, insofar as it affects the welfare of the child:
■ Mr. Hanks presented testimony and evidence regarding Mrs. Hanks’ moral fitness, particularly her going out at night, being with other men,[16] and gambling. This Court finds that the evidence presented does not apply as *218 there was no testimony (evidence) that the behavior in question affects the children’s welfare.
|ia- Dr. Niemann noted that this factor was not applicable.

(7)The mental and physical health of each party:

■ The trial court noted that neither party has any serious physical health problems; but, there was a great deal of testimony and evidence presented at the hearing regarding the mental health of both parents and the treatment they have received for those problems. Both parents have been prescribed anti-depressant and anti-anxiety medications; and Mrs. Hanks was briefly hospitalized for a suicide attempt at the time the parties initially separated. Mr. Hanks alleged that she also physically attacked him at that time, but he later dismissed the protective order he had obtained. There was also a great deal of testimony of Mrs. Hanks’ dependency upon her mother and stepfather.
• Dr. Niemann noted that both parties struggle with diagnosed anxiety/depression for which they take medication; however, both show signs of personality disorder features. It is not appropriate to diagnose either with personality disorders, as the most probable scenario is that these two are a “toxic pairing” who bring out the worst in each other, and will moderate over time when divorced.
(8) The home, school, and community history of the child:
■ The trial court noted that Mr. Hanks resides in the former matrimonial domicile; and the extended families of both parents live in the same community.
• Dr. Niemann noted that the children are young, and the parents are in agreement on school and community issues.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference:
• The trial court noted that the children are only 6 and 8 years of age; therefore, they are not of a sufficient age to express a preference.
• Dr. Niemann noted that this factor was not applicable.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party:[17]
|u- The trial court noted that the testimony and evidence presented shows that each party is willing and able to facilitate and encourage a close and continuing relationship between the two children and the other party.
*219 • Dr. Niemann noted that Ray seems to be progressing in this area. He is especially trusting of maternal grandmother, Mary, whom he sees as critical in his children’s lives (second only to himself). He is becoming less reactive to Ann.
■ Dr. Niemann further noted that Ann is less willing, and seems adamant about having the boys for the majority of the time. Furthermore, her statement that she “hates it that Ray has any rights to [EH]” (not his biological son, but adopted by Ray soon after his birth, and the only father EH knows) is troubling.[18]
(11) The distance between the respective residences of the parties:
■ The trial court noted that both parents live a few blocks apart in the same community.
• Dr. Niemann noted that this factor is not applicable and commented that their residences are close and within the same school district.
• (12) The responsibility for the care and rearing of the child previously exercised by each party:
• The trial court noted that the parties have been exercising shared custody and alternating custodial access under the 11BInterim Order for over two years. The testimony and evidence presented do not show that there have been any significant issues with a shared custody arrangement where neither parent is designated as domiciliary parent.
• Dr. Niemann noted that both played large roles. Ray, as primary wage earner, was less hands-on than Ann, a full-time stay-at-home mother. Ray has since reached out to his parents, especially his father, for assistance when he is working. Ann had an unusual amount of assistance from her mother, Mary, retired at a young age, 58, and financially comfortable.
Based on its consideration of the above factors, the trial court concluded that “it is in the best interest of the children that the parties continue to share custody and that neither parent be designated as the domiciliary parent especially as this has been the arrangement for more than two years.”
The gist of Ann’s assignments of error is that the trial court erred in finding, based on its application of the La. C.C. art. 134 factors, that the best interest of the children dictated that the status quo arrangement be maintained. Ann contends that the trial court abused its discretion by failing to consider significant portions of the evidence introduced at trial and thus abused its discretion. Organized around the applicable Article 134 factors, Ann’s contentions are as follows.
As to the fourth and fifth factors, Ann contends that the trial court abused its discretion in giving great consideration to “the length of time the child[ren] ha[ve] lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment,” and the “permanence, as a family unit, of the existing or proposed custodial home or homes.” La. *220 C.C. arts. 134(4) and 134(5). She contends that the trial court erred in viewing the December 15, 2010 Interim Custody Order as a “baseline from which to set permanent custody.” She cites Ray’s deceitful acts as a basis for not viewing the Interim Custody Order as a 11fi“status quo” requiring no alteration and for not viewing Ray’s residing in the matrimonial home as a “permanency” factor.
According to Ann, Ray’s deceitful acts stem from the December 4, 2010 incident, which she characterizes as a setup to obtain a tactical legal advantage in this custody dispute.[19] In support, Ann cites an entry in Ray’s medical history from his doctor’s appointment on November 22, 2010 — the date Ann filed her petition for divorce. At that doctor’s appointment, Ray’s physician, Dr. Markey, noted:
Mr. Hanks is a 37-year-old man who comes to me today basically to discuss his antianxiety medicines. He has a generalized anxiety disorder for many years. He has changed his medication a number of times.... He has been under terrific stress recently. He says a lot of it is from work and he is in a mid-level managerial position, and there has been a good deal of stress because of the economy. However, what has been even more a bigger problem is that he is in the midst of a divorce. For a variety of reasons, he and his wife are still living together with their children, even though she is serving him papers to get divorced. He feels that has become almost a trap to try to get him to do something that will allow her ... not to have him to be able to see the children.
Ann contends that Ray’s acts on December 4, 2010 were “significantly similar to what he told his doctor at his November 22, 2010 appointment he feared Ann would do to him.” Contrary to Ray’s prediction that Ann would “trap” him, Ann contends that it was Ray who engaged in an elaborate scheme to obtain ex parte custody and prevent her from seeking her children for eleven days — from December 4 to 15, 2010. As a result of this scheme, he also obtained use of the 117matrimonial home. It follows, she contends, that the trial court erred in viewing the existing custody and living arrangements as either a status quo or a permanent living arrangement.
Since the living arrangement was also based on Ray’s deceitful acts, Ann contends that the trial court should not have considered Ray’s living in the matrimonial home as a factor in the “permanence” calculation. She points out that the arrangement of her exercising visitation at her parent’s house was only organized in that manner because Ray orchestrated her removal from the matrimonial home. Moreover, she contends that the trial court erred in finding she still exercises custody at her parents’ home. She points out that since February 7, 2012 — the date on which the Interim Order was modified — that arrangement has not been in place.
As to the seventh factor (the parties’ mental and physical health), Ann contends that the trial court’s reference to her December 2010 hospitalization as the result of *221 a “suicide attempt” was contrary to the evidence. She emphasizes the lack of any indication in her diagnosis that a suicide attempt was made. She contends that no evidence was presented to substantiate the allegation in Ray’s Petition for Protection for Abuse that she “suffers dramatic mood swings and is totally unpredictable.” Moreover, she points out that Ray is the one who was diagnosed by Dr. Niemann with “chronic generalized anxiety.” Ann also points out that Ray was admitted to the hospital on June 30, 2008, for “vague scene of inability to complete a thought clearly,” stress, anxiety, and blurred vision. She 11scontends that the trial court erred in failing to address the evidence regarding the “plethora of medication” Ray consistently has taken.[20]
As to the ninth factor (the children’s preference), Ann acknowledges that the children are too young to voice their preference. Nonetheless, she contends that the trial court ignored the evidence indicating that the children’s reasonable preference is to spend time with their mother and maternal grandparents. In support, she cites her parents’ testimony regarding the children’s distress in transitioning from their mother’s to their father’s custody and in spending time with their father and paternal grandfather. According to Ann, the distress the children displayed in spending time with Ray for the periods provided for in the interim order (the 50-50 arrangement) is an indication that the current equally shared joint custody arrangement is not working smoothly, contrary to Ray’s and Dr. Niemann’s testimony-
As to the tenth factor (the “friendly parent” concept), Ann contends that the trial court erred in finding that both parents have the willingness and ability to facilitate a close and continuing relationship between the children of the marriage and the other parent. Simply stated, Ann contends that she is the friendly parent— the parent who is more likely to encourage an ongoing relationship with the other parent. In support, she cites the following factors as establishing a pattern of behavior by Ray designed to undermine the children’s relationship with their | iamother: (i) his deceitful acts on December 4, 2010; (ii) his derogatory and abusive comments to her in front of the children; (iii) his calling the police three times on her since the Protective Order was dismissed;[21] (iv) his failure to cooperate in making joint decisions regarding the children’s activities and counseling; and (v) his and his family’s general efforts to discredit Ann’s parenting abilities and mental status to Dr. Niemann and at trial.[22] Given Ray’s un *222 willingness to co-parent coupled with her status as the friendly parent, Ann contends that the trial court erred in failing to designate her as domiciliary parent.
As to the twelfth factor (the responsibility for the care and rearing of the children previously exercised), Ann contends that this factor — combined with the third factor (the capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs)— refers to the responsibilities for the care and rearing of the children previously exercised by the parties. She contends that the role of a parent before the separation is a factor to be given significant weight. In this case, however, she contends that the trial court focused solely on the time between the parties’ separation and the trial. The trial court thus erred, she contends, in failing to reference her role as primary caretaker of the children both before the marriage (as to EH) and throughout most of the marriage (as to both children). She notes that she gave up full-time employment | ^during the marriage to attend to the needs of the children.[23] She also points out that she has concerns regarding Ray’s ability to sufficiently watch the children.[24] Ann further contends that the trial court erred in considering as a negative factor the support she receives from her mother and step-father in caring for the children. She contends that the support of her parents should not have been viewed as a negative factor; rather, she contends the extended family support should have been viewed as a positive factor, supporting naming her as domiciliary parent. Given her extended family’s support coupled with her role as primary caretaker, Ann contends that she is the best choice for domiciliary parent.
Finally, Ann contends that even assuming, arguendo, the parties are on equal footing on most of the applicable Article 134 factors, the trial court should have designated her as domiciliary parent given Ray’s deceitful acts. In support, Ann cites Dunklin v. Dunklin, 46,885, p. 9 (La.App. 2 Cir. 2/29/12), 86 So.3d 741, 746. In the Dunklin case, the trial court found that although the parties were on equal footing on most of the applicable Article 134 factors, the defendant-mother’s “unfounded allegation of child abuse by [the] plaintiff[father] indicated defendant’s unwillingness to encourage a close relationship between the children and plaintiff’ and dictated the plaintiff-father’s designation as domiciliary parent. Id. By analogy, Ann contends Ray’s unfounded call to emergency services on December 4, 2010 and his allegations of Ann’s suicidal and homicidal be-haviorj^were calculated to bring about a legal advantage in this custody dispute and thus were evidence of his unwillingness to co-parent. Given his unwillingness to co-parent, Ann contends that she should be designated domiciliary parent.
Ann’s reliance on the Dunklin case is misplaced for two reasons. First, unlike in Dunklin, there is no allegation of sexual abuse of the children in this case.[25] Sec *223 ond, Ann’s contention that the December 4, 2010 incident was a setup designed to gain a legal advantage is not supported by any direct evidence. Ann listed in her pre-trial order as a “may call and rebuttal witnesses” the EMS personnel and police officers who were called to the parties’ home on December 4, 2010; she noted the purpose for these witnesses’ testimony was that “they have contradicted and disputed Raymond Paul Hank, Jr.’s allegations contained in the Petition for Protection from Abuse which he filed in order to obtain ex-parte custody.” At trial, however, she failed to call any of the EMS personnel or police officers. Although on December 15, 2010, Ray dismissed with prejudice his Petition for Protection from Abuse, he did not admit the allegations he made in his petition were false. Rather, he explained at trial that he dismissed the petition because he did not want to say the wrong thing. He further explained that he did not believe at the time that he “had enough material evidence to substantiate the allegations.”
According to Dr. Niemann, the only thing certain about the December 4, 2010 incident is the hospital records. Ann’s discharge record from River Oaks Hospital states that she was admitted on December 5, 2010 for “secondary to ^depressed mood with reported suicidal ideation ‘out of anger’ following talking about divorce with her husband and thought of losing her kids.” Dr. Niemann noted that the hospital records did not indicate “a serious suicidal ideation;” rather, the records indicate an overwhelmed state.[26]
At trial, Dr. Niemann testified that she could not say that the December 4, 2010 incident was a setup. She explained that “people are just in such a chaotic state when these things happen that there are these blowups; and most people are not sophisticated enough to set up on purpose.” She further explained that “both of them [Ray and Ann] had a different story to tell, and they don’t agree.” Dr. Niem-ann testified that her belief was that whatever happened was an unfortunate blowup, not a setup.
Regardless of whether the December 4, 2010 incident was a ploy on Ray’s part to obtain an advantage in this custody dispute, the record reflects that on December 15, 2010, the parties mutually agreed to an interim order providing for joint custody and equal sharing of the children (week-on, week-off, 50-50 arrangement) with no domiciliary parent designated. From December 2010, when the Interim Order was entered into, until the May 2012 trial, nothing prohibited Ann from seeking to change the status quo. On multiple occasions, the hearing on the custody and domiciliary issues was jointly continued. The trial court thus did not err in relying on the status quo in making its rulings.
As noted above, Ann also contends, like the mother in Dunklin, supra, that the trial court erred in failing to give weight to her role as the primary caretaker of |2sthe children during the marriage. However, in this case, as in Dunklin, both parents, under the December 15, 2010 interim order, exercised physical custody of the children on alternating weeks for over a year before the trial date. Thus, as in Dunklin, the trial court was entitled to consider the evidence that “the parties had shared *224 physical custody of their children on a roughly equal basis for more than one year prior to trial.” Dunklin, 46,885 at p. 10, 86 So.3d at 746. Moreover, as noted elsewhere, Ann’s role as primary caretaker was often exercised with the help of her mother.
At trial, Dr. Niemann confirmed her recommendation, based on the Article 134 factors, of “[w]eek-on, week off, 50-50 time” with Ray designated as domiciliary parent. She testified that there was nothing negative regarding Ray’s designation as domiciliary parent. She further testified that there was nothing negative about Ray and Ann being designated as co-domiciliary parents, provided they could work together. She, however, testified that she could not recommend Ann being designated as domiciliary parent.
Dr. Niemann indicated that she had no concerns with Ray’s or Ann’s parenting abilities; however, as to Ann, she testified that “[t]he only concerns [she] ha[d] from the evaluation is that she’s parented with the assistance of her mother exclusively and that, if she were on her own, it’s a question mark as to how that would go for her and the kids.” Dr. Niemann acknowledged that she was unaware of whether Ann’s mother was still providing such assistance following the evaluation. Nonetheless, Dr. Niemann testified that there were several things Ann said that indicated she was very dependent upon her mother.
Dr. Niemann additionally testified that the children had adjusted to the current custody arrangement and recommended that it be maintained. In her report, 124Pr. Niemann noted that the parents “[b]oth describe this [week-on, week-off schedule] as stressful for the boys, but improving.” Explaining why she opined the children had adjusted to the schedule, Dr. Niemann testified that both Ray and Ann told her that the boys had “started to get used to the idea and started — because it was routine. It was beginning to be a routine.” Dr. Niemann also testified that the adjustment of children is a “moving target.”
In her report, Dr. Niemann stated that “[b]oth [parents] describe the boys as showing significant symptoms associated with separation anxiety at various times, especially following transitions.” Although Dr. Niemann acknowledged that the children displayed post-divorce related anxiety, she testified that this was consistent with any child , in that setting. To illustrate, she cited the instances of the children not necessarily wanting to go with their father, Ray. She testified that it was the job of whoever had the children to help them with that transition.[27] She also described Ray’s interactions with both boys as “very warm and responsive;” and she noted that “both boys were obviously very happy to be with him: playful, responsive, having a good time.”
Ann contends that Dr. Niemann’s opinions, especially that the children had adjusted to the 50-50 shared custody arrangement, were based on skewed data and insufficient information. Ann points out that Dr. Niemann did not hear any testimony subsequent to her testimony on the first day of trial. Ann notes that lasduring the last three days of trial, a significant amount of evidence was intro *225 duced that the children were not doing well under the existing shared custody arrangement. In support of the argument that the current shared custody arrangement is detrimentally affecting the children, Ann provides citations to five pages of testimony from the four-day trial. Apparently, those references are to her mother’s and step-father’s testimony regarding the children’s distress over transitioning to Ray’s house,[28] her testimony as to why co-parenting was not working, her testimony regarding Ray calling her vulgar names in front of the children, and her testimony regarding Ray’s refusal to agree on enrolling the children in extra-curricular activities — t-ball and catechism.
According to Ann, Dr. Niemann told her, when they first spoke, that “[t]here’s no way in hell that Ray will — that I will let Ray as domiciliary.” Ann emphasizes that both her and her parents were unaware they were supposed to provide Dr. Niem-ann with evidence discrediting Ray. She and her parents both believed that the custody evaluation was not a proper venue for trashing the other parent; hence, neither she nor her parents produced any such evidence. In contrast, Ray and his father, Ray, Sr., produced significant evidence to Dr. Niemann designed to discredit Ann and her parents.[29] Ann also testified that Dr. Niemann | ^never met with her and the children and never observed her and the children in the waiting room. Ann’s parents corroborated her testimony.
Dr. Niemann, in contrast, testified that she met with Ann and the children and that she carefully observed them in her waiting room. Moreover, in her report, Dr. Niemann documented her observations, stating that during the family visit “[t]he boys behaved warmly towards mother Ann, but seemed to seek comfort from grandmother Mary.” Dr. Niemann also testified at trial that she told Ann she could provide her with any information she wanted to provide, but Ann failed to provide anything other than the intake questionnaire. With regards to which parent was the “friendly parent,” Dr. Niemann stated in her report that “[b]oth parents have made accusations against the other that are impossible to verify, and are likely to have been exaggerated, probably without intention.... Overall, these accusations and inappropriate behaviors even out.”[30]
*226 As to the parties’ ability to make decisions together, Dr. Niemann testified that Ray and Ann agreed on schools before the evaluation and that they were in agreement on most issues with the exception of the children’s activities. Dr. Niemann labeled Ray as more conservative about activities, noting that he thought it was too soon — “not now.” She testified that Ray did not tell her that he did not want to put EH in t-ball because he did not have time. Rather, she testified that Ray |27told her that “he thought that there was time for that later on.” She testified that the same was true for putting EH in catechism class; Ray told her he just was not ready for it now.
Similarly, Ann testified that she and Ray “are able to agree on the major aspects of [their] children’s lives.” The only exceptions she mentioned at trial were counseling and extra-curricular activities. As to counseling, Ann testified that she believed both children should be in counseling, but Ray disagreed.[31] As to activities, Ann testified, similar to Dr. Niemann, that she and Ray disagreed over whether EH should play t-ball and start catechism class. According to Ann, Ray said “he really didn’t have time, that T-ball took a lot of time, and he wouldn’t really have— have time to take him.” She testified that Ray told her he did not have time because of his work schedule and that he did not feel like he should do t-ball at that particular time. As to catechism, she claimed Ray told her he did not believe in that faith anymore. Ann acknowledged that Ray subsequently allowed her to enroll EH in catechism. She also testified that Ray subsequently, without informing her, enrolled EH in baseball. Ray also unilaterally enrolled the boys in Boy Scouts.
Given the decision-making difficulties, the children’s reluctance to spend long periods with their father and paternal grandfather, and other specific facts of this case, Ann contends that the trial court erred in finding equal — strict 50-50 — sharing of physical custody to be in the best interest of the children. She cites the jurisprudence holding that joint custody does not mandate strict 50-50 sharing of physical time. See Pender v. Pender, 38,649, p. 9 (La.App. 2 Cir. 5/12/04), 890 So.2d 1, 6 (“finding that] the trial court was not manifestly erroneous in awarding [other parent] substantial time rather than strict equality of time.”)
The jurisprudence has recognized that “only if it is both feasible and in the best interest of the child, should the court consider granting equal physical custody to the parents.” Stephens v. Stephens, 02-0402, p. 8 (La.App. 1 Cir. 6/21/02), 822 So.2d 770, 777. Such is the case here. As noted, the trial court, agreeing with Ray, found that, given the present custody arrangement — 50-50 equal sharing — has worked for over two years for this family without a major hurdle, the best interest of the children dictated that this arrangement be maintained. In light of the emphasis on maintaining continuity of the child’s environment codified in La. C.C. art. 134(4), we cannot conclude the trial court abused its discretion in finding that maintaining the existing shared joint custody arrangement is in the best interest of the children under the facts of this case. See Gerhardt v. Ger- *227 hardt, 46,463, pp. 7-8 (La.App. 2 Cir. 5/18/11), 70 So.3d 863, 868, (citing Pender, supra, and holding that “[c]ontinuity and stability of environment are important factors to consider in determining what is in the best interest of the child.”)
Our finding is buttressed by the jurisprudence holding that such an equal sharing of custody (50-50, week-on, week-off) arrangement is appropriate in rare cases that fit a certain fact pattern. Barber v. Green, 49,049, p. 6 (La.App. 2 Cir. 2/19/14), 134 So.3d 1223, is illustrative.
In Barber, the parties had an interim 50-50 arrangement, which the trial court refused to continue; instead, the trial court awarded the father reasonable visitation rights. Reversing, the appellate court found the trial court abused its discretion by not awarding physical custody on a rotating weekly basis. The appellate court reasoned as follows:
129We recognize that shared custody does not require adherence to an inflexible 50-50 calculation of the number of minutes each parent enjoys with the children. We know that this is the rare case allowing for weekly rotation. Geography, schooling, education, culture, extended family, and parenting skills are not a problem here. Both parents love these children and are loved by these children. Each parent is gainfully employed.
Barber, 49,049 at p. 6, 134 So.3d at 1227. In Barber, the court also noted that “[e]aeh parent testified, notably, that the other was a good parent.” Barber, 49,049 at p. 1, 134 So.3d at 1224. The court-appointed social worker also testified that the weekly arrangement was “working well for the minor children.” Barber, 49,-049 at p. 2, 134 So.3d at 1224. The appellate court in Barber thus reinstated the shared physical custody, 50-50 arrangement.
The facts of this case are parallel to those in Barber, supra. Geography in not a problem here since the parents and grandparents live close by to each other. Schooling is not a problem; the parents agreed on the children’s schools and live in the same school district. Both parents are supported by their extended family — the children’s grandparents. Parenting skills are not a problem; both parents, as Dr. Niemann testified, have good parenting skills, although Ann has relied heavily on her mother in the past. Both Ray and Ann love these children and are loved by the children. Both parents are gainfully employed. Thus, as in the Barber case, this is a rare case in which a 50-50 joint custody arrangement, with a weekly rotation, is appropriate. The trial court’s finding that this arrangement should be maintained was not an abuse of discretion.
As to the domiciliary parent issue, the trial court found, again based on the status quo, that no domiciliary parent should be designated. This court in Molony v. Harris, 10-1316, p. 19 (La.App. 4 Cir. 2/23/11), 60 So.3d 70, 82, held that “[although La. R.S. 9:336 provides that ‘[jjoint custody obligates the parents to |3nexchange information concerning the health, education, and welfare of the child and to confer with one another in exercising decision-making authority,’ we find no authority for the court to designate the parties as co-domiciliary parents.” Id. We further noted that “[t]he statute does permit the court to decline to designate a domiciliary parent if one of two exceptions applies: (1) a valid implementation order to the contrary must have been provided by the trial court, or (2) good cause not to name a domiciliary parent has been shown.” Id. The issue presented here is whether either of these exceptions apply.
An “implementation order to the contrary” must satisfy the requirements of *228 La. R.S. 9:335(A) “by specifically allocating physical custody times for each parent and allocating the legal authority and responsibility of the parents.” Randazzo v. Prosperie, 13-0704, p. 8 (La.App. 1 Cir. 9/13/13), 135 So.3d 22, 28 (citing Wolfe v. Hanson, 06-1434, p. 6 (La.App. 1 Cir. 5/2/08), 991 So.2d 13, 17). No specific form is required for a joint custody implementation order. See Stewart v. Stewart, 11-1334, p. 4 (La.App. 3 Cir. 3/7/12), 86 So.3d 148, 152 (agreeing with the holding in Caro v. Caro, 95-0173, p. 3 (La.App. 1 Cir. 10/6/95), 671 So.2d 516, 518, that “ ‘La.R.S. 9:335 does not require a specific form be used for the implementation plan.’”) In this case, we find there is no joint custody implementation order. The trial court’s judgment at issue, dated June 28, 2013, simply “awarded shared custody of the minor children,” and provided that the parties “shall alternate custodial access with the minor children as previously agreed in the Interim Order stipulated in open Court on December 15, 2010 signed on March 2, 2011.” See St. Philip v. Montalbano, 12-1090, pp. 2-3 (La.App. 4 Cir. 1/9/13), 108 So.3d 277, 278-80 (illustrating a detailed custody plan that satisfied this exception).
| a,As to the “good cause” exception, the statute is silent as to what constitutes good cause in this context. As a commentator has noted, the term good cause “is loosely defined as ‘a legally sufficient reason.’ In actuality, good cause is a very subjective term and is left to the discretion of the trial judge rendering the custody decree.” Tamyra Nicole Craig, Who’s the Boss ? Issues with Co-Domiciliary Parenting in the State of Louisiana, 39 S.U. L.Rev. 317, 335 (2012). Ann contends that the facts of this case — involving two parents who cannot agree — preclude a finding of “good cause” and dictate the appointment of a domiciliary parent. She further contends that because of Ray’s “continual involvement of the police in unwarranted situations” and inability to co-parent, this case is analogous to the Wolfe case.
In the Wolfe case, the appellate court concluded that the appointment of a domiciliary parent was required given the parties’ failure to effectively communicate coupled with the fact that their “heated arguments” had led to police involvement. Wolfe, 06-1434 at p. 9, 991 So.2d at 18.[32] Ann contends the same result is warranted by the facts of this case, which support her appointment as domiciliary parent.
As noted, the trial court, in its reasons for judgment, cited as its reason — its good cause — for declining to designate a domiciliary parent the fact that the parties had operated without one for over two years. The trial court found that “[t]he testimony and evidence presented do not show that there have been any significant issues with a shared custody arrangement where neither parent is designated as | Si>domiciliary parent.” As discussed below, we find it unnecessary to resolve the issue of whether the trial court’s reasoning constitutes good cause for failing to designate a domiciliary parent.
Given the lengthy delays in this case coupled with the particular factual scenario of a family that has operated without a domiciliary parent for over two years at the time of trial, we find the appropriate relief is to remand to the trial court for it to revisit the domiciliary parent issue. See La. C.C.P. art. 2164 (providing that “[t]he appellate court shall render any judgment *229 which is just, legal, and proper upon the record on appeal.”) This relief is warranted given the following three lengthy delays in this matter: (i) between the initial, interim order^ — December 2010 — and the trial date — May 2012; (ii) between the trial— May 2012 — and the trial court’s rendering of the judgment — June 2013; and (iii) between the trial court’s judgment — June 2013 — and the submission of this case for decision on appeal — April 2014. As result of these delays, the only expert advice in this case is now stale' — Dr. Niemann’s report is dated October 2011. Moreover, as discussed above, the parties have operated without a domiciliary parent without any major hurdles for over three years at this time. Thus, we pretermit deciding if there was good cause to not designate a domiciliary parent and remand to the trial court with instructions to revisit the domiciliary parent issue.
Regardless of whether a domiciliary parent is designated, a joint custody implementation order is required in all cases in which joint custody is ordered, absent a showing of good cause. La. R.S. 9:335(A).[33] The same “good cause” | ^exception thus appears in both prongs of the statute. Given our decision to remand, we find it unnecessary to address the good cause exception under this prong of the statute. Nonetheless, given the contentious nature of this custody dispute, we order the trial court on remand issue a joint custody implementation order, regardless of its determination on the domiciliary parent issue.
We further order the trial court on remand to consider appointing a parenting coordinator under La. R.S. 9:358.1-9:358.9.[34] As this court has noted, the appointment of a parenting coordinator is especially appropriate in contentious child custody cases such as this one. See Molony, 10-1316 at p. 20, 60 So.3d at 82-83 (citing Palazzolo, 08-0075 at pp. 54-56, 10 So.3d at 779-80 (extensively |a4discussing the appointment of a parenting coordinator in high-conflict custody cases)).[35]
*230 Finally, Ann argues in her appellate brief, as she did in her post-trial memorandum, that “all other provisions of all prior Judgments which are not inconsistent with the Judgment rendered herein should remain in full force and effect.” In support, Ann cites Steele v. Steele, 591 So.2d 810 (La.App. 3rd Cir.1991), and Lawrence v. Lawrence, 02-1066 (La.App. 3 Cir. 3/5/03), 839 So.2d 1201. Those cases stand for the proposition that “[t]o have an injunction against harassment survive a divorce, it must be contained in the divorce judgment.” 1 Robert C. Lowe, LA. PRAC. DIVORCE § 8:290 (2013 ed.) (citing Steele, supra, and Lawrence, supra). Although the trial court’s June 28, 2013 judgment at issue on this appeal is silent on this issue, the divorce judgment, dated February 14, 2012, states that “all prior Judgments shall remain in full force and effect.” Given that language in the divorce judgment, we find the injunctive relief provided in the prior judgments was adequately preserved.

DECREE

lafjFor the foregoing reasons, the judgment of the trial court awarding shared joint custody — week-on, week-off, 50-50 time with each parent — is affirmed. This case is remanded to the trial court with the following instructions: (i) to revisit the domiciliary parent issue under La. R.S. 9:335(B); (ii) to issue a joint custody implementation order under La. R.S. 9:335(A); and (iii) to consider appointing a parenting coordinator under La. R.S. 9:358.1-9:358.9.
AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.

. The initials of the two minor children involved in this case — EH and ZH — are used in this opinion in order to protect their privacy. ZH was the only child born of the marriage. EH is Ann's biological child. Ray was present for EH's birth and adopted EH. Ray is the only father that EH has ever known. Ray has always treated both children the same.

. As to the emotional event that occurred on December 4, 2010, Ray and Ann provided different stories regarding what transpired. The children were not home at the time of the event because Ray had arranged for his father to take them. It is undisputed that Ray called 911 and reported that Ann had tried to kill herself by consuming pills. As a result of the 911 call, the police and emergency medical services ("EMS”) responded. According to Ray, an EMS supervisor told him that Ann admitted to the police that she was homicidal and suicidal. EMS took Ann to the hospital (Ochsner on the West Bank of New Orleans); and she was subsequently transferred to a psychiatric hospital (River Oaks Hospital in Harahan).
According to Ann, she and Ray had a heated argument at their home that day. She developed a headache, went into the bedroom, took two Tylenols, and was lying in bed not saying anything. At that point, she claims that Ray, for no good reason, called the police. The police, EMS, and fire department responded. She was informed that because it was alleged that she overdosed on medication, a toxicology screen was required. She thus agreed to go to the hospital. Because she was so upset, the doctor at the hospital recommended that an evaluation be done. Believing that the evaluation would be done at the hospital, she agreed. She was unaware that she would be transferred to River Oaks Hospital, a psychiatric hospital, for the evaluation. She testified that on the night of the incident Ray came to the hospital for a brief period at about 10 p.m., took her cell phone, and left. She testified that she told him she needed her phone to get her work shifts covered, but he left with her phone. At trial, the parties stipulated that Ann’s toxicology test results from Ochsner were negative for all substances.

. When asked at trial why; despite the horrific allegations in his petition for protection from abuse, he dismissed his petition with prejudice on December 15, 2010, Ray replied that he did not want to say the wrong thing and cause problems. Ray additionally stated that "[a]t that time, I don’t believe that we had enough material evidence to substantiate the allegations.” He also explained that his understanding was the prior trial judge [Judge Lobrano] "had made several phone calls ... to police and ... EMS personnel, and that in chambers ... she spoke individually to certain people that were on the scene.” He explained that he was not present in chambers during those calls. He admitted that he contemporaneously tried to call the EMS supervisor twice and that the judge’s assistant came out and instructed him to stop trying to call the EMS supervisor.

. Upon release from the hospital, Ann returned to live with her mother, Mary Klein, and step-father, Claude Klein. Ann's father died of a heart attack when she was a teenag *212 en Ann’s mother married Mr. Klein when Ann was eighteen years old.

. Both Ray and Ann tested negative.

. As noted, Ann testified that Ray came to the hospital on the night of the December 4, 2010 incident and took her cell phone. According to Ray, Ann gave him her cell phone. According to Ann’s mother, Mrs. Klein, the reason Ann gave Ray her cell phone was because it needed to be charged. Mrs. Klein testified that she subsequently attempted to retrieve Ann’s cell phone from Ray, but he refused to return it to her. Indeed, Ray failed to return the cell phone until ordered to do so by the court on December 15, 2010.

.On March 1, 2011, the Motion for Custody was continued without date. On May 3, 2011, the Court, on joint motion, continued the Motion for Custody, among other matters, to August 2, 2011. On August 2, 2011, the Motion for Custody, among other matters, was continued to September 6, 2011. On September 6, 2011, the Motion for Custody was again continued to November 8, 2011. On November 8, 2011, the Motion for Custody was continued to February 7, 2012. On February 7, 2012, the trial court granted the divorce, noted the parties reached a consent judgment on several matters, set a pre-trial conference for April 27, 2012, and a trial date of May 7, 2012. Thus, the determination of domiciliary status was not addressed until the matter went to trial in May 2012.

. At trial, Ann admitted these two violations of going within 100 yards of Ray’s residence. She testified that she removed mail from the mailbox. She explained, that she was looking for her W-2s because she was afraid Ray would not give them to her. She also admitted that she had someone paint the address on the curb and that she did not ask Ray before doing so.

. Dr. Niemann testified that she was unaware of any requirement that she conduct a home visit or home study. Regardless, she explained that a home study was unnecessary in this case since neither party disputed the “fitness of the home.”

. On March 21, 2012, Ann filed a Motion to Strike Evaluator’s Report and Testimony for Court Costs and Actual Attorneys’ Fees. Ann’s motion was based on Dr. Niemann's alleged failure to provide documentation after repeated requests and further court orders and failure to respond to multiple attempts via certified mail to set dates for depositions. On May 2, 2012, Ann dismissed her motion to strike the evaluator's report with the exception of her request for court costs and actual attorneys' fees. She did so based on the fact that the evaluator's records were recently dropped off at her attorney’s office.

. Dr. Niemann further recommended the following:
1. In this family, grandparent involvement is perhaps a plus for the children, given all the factors. However, the grandparents should refrain from making negative comments about either parent or about one another,
2. Grandparents should refrain from acting as agents for Ann and Ray, allowing the parents to develop their own methods of communication and co-parenting skills.
3. Ray and Ann, as co-parents, should agree on major aspects on the children’s lives, including school, sports and other activities, medical care, and other matters. The children can alternate weekends and participate in each parent's religious activities. Participation in organized sports is highly encouraged, with both parents and extended family members attending when possible.
4. Ray and Ann may implement adjustments in the week-on, week-off schedule, such as Wednesday overnights with Ann, if the parents can agree. On adjustments, Ray will have the final say as domiciliary parent.
5. Holidays should be divided and shared in a manner that best serves the children’s optimal holiday experience.
6. Individual counseling is encouraged for both parents.

. The trial court's February 7, 2012 ruling was reduced to judgment on April 27, 2012. On that same date a pre-trial conference was held.

. Additionally, it was order that "neither party shall have overnight guests of the opposite sex while the children are in their custody-”

. La. 9:355(B) provides:
(1) In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown.
(2) The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents.
(3) The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child.

. A distinction exists between the physical sharing of custody of the children and the designation of a parent to exercise legal custody — the domiciliary parent. Explaining this distinction, the Louisiana Supreme Court in Evans v. Lungrin, 97-0541, 97-0577, pp. 10-11 (La.2/6/98), 708 So.2d 731, 737 stated:
The term "custody” is usually broken down into two components: physical or "actual” custody and legal custody. The typical joint custody plan will allocate time periods for physical custody between parents so as to promote a sharing of the care and custody of the child in such a way as to ensure the child of frequent and continuing contact with both parents. George D. Ernest, III, Joint Custody and Parents’ Liability Under Civil Code Article 2318, 44 La. L.Rev. 1791 (1984). Legal custody, by contrast, has previously been defined as “the right or authority of a parent or parents, to make decisions concerning the child's upbringing.” See Ernest, supra note 5, at 1792. Pursuant to this definition, both parents remained legal custodians of the child regardless of which parent had physical custody of the child at a given time under the typical joint custody plan. Joint legal custody thus involved a sharing of the responsibilities concerning the child including decisions about education, medical care, discipline and other matters relating to the upbringing of the child. Ernest, supra at 1792.

. Ray presented the testimony of Ann’s friend, Barbara Mula, regarding these issues. Mula testified that she saw Ann kiss two other men while Ann was still married to Ray.

. Factor ten codifies the "friendly parent” concept. The "friendly parent” concept refers to the principle that "primary residential placement is awarded to the parent most likely to foster the child's relationship with the other parent. This is often reflected in statutes that establish that it is a matter of public policy that children have 'frequent and continuing contact' with both parents.” Lawrence v. Lawrence, 105 Wash.App. 683, 687, 20 P.3d 972, 974 (2001). The "friendly parent” concept, however, has been noted to present a paradox or inherent contradiction. Margaret K. Dore, The “Friendly Parent” Concept: A Flawed Factor for Child Custody, 6 Loy. J. Pub. Int. L. 41, 42 (2004). As this author explains, "[t]his is because in a child custody dispute, the parents are in litigation against each other. The purpose of this litigation is to take custody away from the other parent, which by definition does not foster the other parent’s relationship with the child. The friendly parent concept, however, requires parents to make the opposite showing, that they will ‘most likely foster ... the other parent’s relationship with the child.’ ” Id.

. Ann testified that Dr. Niemann misquoted her. Ann explained that what she actually said was that she hates the fact that because Ray is not EH’s biological father he could keep her children away from her for eleven days, as he did in the restraining order. She clarified that she did not hate the fact that Ray is involved in EH's life, that she was glad that EH knows Ray as his father, and that he is a good father. Dr. Niemann, on the other hand, testified that Ann’s concept was concerning especially given that EH was unaware of the fact he was not Ray’s biological child. She also voiced concern that EH would pick up on the notion that there was a difference.

. Ann also notes the Interim Custody Order was made as a "stipulation without prejudice to either party.” The stipulation, however, was simply designed to avoid the original custody arrangement, agreed to by the parties, from becoming a considered custody degree under Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986). See 1 Robert C. Lowe, LA. PRAC. DIVORCE § 7:71 (2013 ed.) (noting that "[w]hen a considered decree is at issue, the party seeking a change of custody bears the burden of proving that a continuation of the present custody is so deleterious to the child as to justify a modification of custody, or of proving by clear and convincing evidence that any harm likely to be caused by a change of environment is substantially outweighed by the advantages to the child.”)

.At trial, Ray identified his prescription records for various medications, including anti-inflammatory, anti-depressant, blood pressure, and pain medication. Ray explained that certain medications — such as the pain medications — were for the ruptured disc in his neck. Ray admitted that while he was taking some of these prescription medications, he smoked weed "on occasion." He also admitted that he did not tell this to his doctors and that he did not know if his doctors would have prescribed the medication if they knew this. Ann testified that she never smoked marijuana. However, Ricky Becnel, Jr., testified that he smoked marijuana recre-ationally at a party with Ann and Ray about two years before trial. He testified that Ann was smoking marijuana.

. These three incidents apparently are the same incidents referred to in Ray’s motion for contempt.

. At trial, Ray call Mr. Becnel as a witness to testify regarding Ann's alleged routine of "usually sleepfing] in” until noon. Ann points out that Mr. Becnel testified that he did work at their house sometime between Thanksgiving and January 2010, but she no longer lived in the house as of December 4, 2010. Mr. Becnel testified that the dates he worked on the house could have been off and *222 that it could have been from the beginning of October to the end of December.

. Mrs. Klein, Ann’s mother, testified that it was Ann who was the primary caretaker of the children during the marriage. She explained that during the marriage Ray worked a lot, leaving Ann to take care of the children.

. As an example, Ann testified that Ray lets the oldest child, EH, ride a go-cart by himself and lets the youngest child, ZH, ride with EH in the go-cart. She testified that EH burned his hand on the go-cart. A picture of a blister on EH's hand as a result of a burn from the go-cart was introduced at trial. No medical attention was sought for this injury.

.The only mention of such abuse in the record in this case is an allegation in Dr. Niemann’s report regarding Ann’s step-father *223 abusing her. At trial, Ann's step-father testified that Dr. Niemann told him there was an allegation that he molested Ann, which was a total shock to him. Dr. Niemann also told him that Ann said she never made that allegation to Ray, and Dr. Niemann assured him she gave no validity to it and that she never thought it occurred.

. As noted elsewhere, Ann's toxicology test results from Ochsner were negative.

. At the close of the trial, the trial court judge provided advice to the parties on this issue, stating:
If your children are having difficulty in the exchange, my suggestion is speak to one another about a counselor or therapist, try to come to some agreement. I understand it may be happening in — -in both households. I don’t know that. The testimony hasn’t been as such, but that's a — that was a suggestion that I’m making to — to your— to you all through your attorneys.

. Ann notes that both her parents testified to the children's distress when they are required to leave Ann’s care and transfer to Ray's care. She notes that on a number of times the children were kicking and screaming in protest. Ann’s step-father gave a detailed example of EH's behavior when getting off the school bus in front his maternal grandparent’s home and greeted by Ray, Sr. Her stepfather testified that EH was extremely upset about having to go with Ray, Sr. Ray likewise acknowledged that there were times since December 15, 2010 when the children were upset, kicking, screaming, throwing a fit, and combative to go with him.

. The items Ray and his father provided to Dr. Niemann include an audio transcript of Ray confronting Ann at 9:20 a.m. on a Saturday morning while they were still married; a six page letter from his father (Ray Sr.); and a summary he prepared of text messages between him and Ann. Ray explained that the purpose of the audio transcript was to give Dr. Niemann a glimpse of their home environment — "to bring forth information about how life was in our household.” He further explained that the reason he was trying to get Ann to get out of bed that morning was because they had agreed he would do something in the attic and that he needed to start before 10 a.m. The children were present during this incident. Dr. Niemann testified that this incident did not involve co-parenting since the parties were still together. She further testified that she did not take this into consideration in the evaluation.

.A major example of this is the December 4, 2010 emotional episode that Ann contends Ray setup. A minor example is Ann’s allega *226 tion that Ray passed the children’s bus stop on her weeks while they were sharing custody to see who was putting the children on the bus. Dr. Niemann testified that according to Ray it was a coincidence. Ray likewise testified it was a mere coincidence.

. Ann states in her post-trial memorandum that the children were enrolled in counseling since May 2012 at the Plaquemines Care Center.

. We note that the jurisprudence has split on whether animosity between the parents constitutes "good cause” for failing to designate a domiciliary parent. See 1 Robert C. Lowe, LA. PRAC. DIVORCE § 7:58 (2013 ed.) (summarizing the conflicting case law).

. La. R.S. 9:335(A). provides:
A. (1) In a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown. (2) (a) The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents, (b) To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally. (3) The implementation order shall allocate the legal authority and responsibility of the parents.

. We note that the term "good cause” also appears in La. R.S. 9:358.1. The comments to this statute address the “good cause” for appointment a parenting coordinator as follows:
The court may appoint a parenting coordinator on its own motion or on motion of a party only upon a showing of "good cause shown." "Good cause” includes a determination by the court that either or both parties have demonstrated an inability or unwillingness to collaboratively make parenting decisions without assistance of others or insistence of the court. "Good cause” may also include an inability or unwillingness to comply with parenting agreements and orders or a determination by the court that either or both parties have demonstrated an ongoing pattern of unnecessary litigation, refusal to communicate or difficulty in communicating about and cooperation in the care of the children, and refusal to acknowledge the ’ right of each party to have and maintain a continuing relationship with the children.
Comments to La. R.S. 9:358.1, comment (c).

.As we noted in Molony, 10-1316 at p. 20, n. 7, 60 So.3d at 83, the purpose behind the Parent Coordinator Act is explained in the comments, which provides:
Parenting coordination is a child-focused alternate dispute resolution process in *230 which a duly qualified parenting coordinator assists parents or persons exercising parental authority to implement a parenting plan by facilitating the resolution of their disputes in a timely manner and by reducing their child-related conflict so that the children may be protected from the impact of that conflict. The parenting coordinator assists the parties in promoting the best interests of the children by reducing or eliminating child-related conflict through the use of the parenting coordination process.
La. R.S. 9:358.1, Comment (a).